**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 17, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CARLOS FERNANDEZ-BARRON,

Defendant - Appellant.

No. 18-1254
(D.C. No. 1:15-CR-00360-RM-5)
(D. Colo.)

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CR-00360-RM-5)**
_____

Ty Gee, Haddon, Morgan and Foreman, P.C., Denver, Colorado, for
Defendant-Appellant.

Karl L. Schock, Assistant United States Attorney (Jason R. Dunn, United
States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-
Appellee.
_____

Before **BACHARACH**, **KELLY**, and **CARSON**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This case involves a drug ring that repeatedly transported large

quantities of cocaine from El Paso to Denver. The government alleged that

Mr. Carlos Fernandez-Barron had participated, supporting this allegation with evidence referring to two cars: a BMW and Chevrolet Impala.

The government relied in part on a text message asking Mr. Fernandez-Barron about the timetable for delivery of a "BMW." An expert witness for the government testified that "BMW" was code for a load delivery of cocaine (rather than an actual BMW). Mr. Fernandez-Barron denied that the message referred to cocaine, testifying that he had been in the process of selling his BMW and arranging to deliver the car.

The references to the Impala stemmed from testimony by another participant in the drug ring, Ms. Martha Mota. Ms. Mota testified that

- she had driven cocaine to two men in Kansas City and

- the two men had arrived in a car that looked like an Impala.

She stated that one of the men was the same person depicted in a photograph of Mr. Fernandez-Barron. But Ms. Mota couldn't recognize this man in the courtroom during the trial.

Mr. Fernandez-Barron was ultimately convicted on charges of conspiracy, distribution, and possession with intent to distribute cocaine.[1]

---

[1] The convictions involved

- conspiracy to distribute and possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine and

At sentencing, the district court found that Mr. Fernandez-Barron had committed perjury when testifying that he

- had sold a BMW in May 2014 and

- did not own an Impala.

For this finding, the district court determined that Mr. Fernandez-Barron (1) had not sold a BMW until September 2014 and (2) had owned an Impala. Based on the perjury, the court imposed a two-level enhancement for obstruction of justice.

Mr. Fernandez-Barron appeals, challenging the enhancement for obstruction of justice. We conclude that the district court did not err in applying the enhancement.

## I.   The Finding of Perjury

The sentencing guidelines call for a two-level enhancement if the court finds obstruction of justice. U.S.S.G. § 3C1.1. This finding can be based on perjury. *Id.* at cmt. n.4(B); *see United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (applying the definition of perjury in 18 U.S.C. § 1621 to review an enhancement for obstruction of justice under U.S.S.G. § 3C1.1). "To establish perjury, a district court must conclude the defendant (1) gave false testimony under oath, (2) about a material matter,

---

- distribution and possession with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine.

3

and (3) the false testimony was willful and not the result of confusion, mistake or faulty memory." *United States v. Rodebaugh*, 798 F.3d 1281, 1300 (10th Cir. 2015) (quoting *United States v. Poe*, 556 F.3d 1113, 1130 (10th Cir. 2009)).

The district court found all of these elements and imposed a two-level enhancement for obstruction of justice. Mr. Fernandez-Barron challenges the findings on willful falsity[2] and materiality, and we reject these challenges.

## II.   The Standard of Review

In assessing "the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011).

## III.   Perjury Regarding the BMW

The district court concluded that (1) Mr. Fernandez-Barron had willfully given false testimony about when he sold his BMW and (2) this false testimony was material. On appeal, Mr. Fernandez-Barron argues that the testimony was immaterial and apparently challenges the element of willful falsity.

---

[2]    In his opening brief, Mr. Fernandez-Barron asserts that his testimony about the Impala was not false. But rather than develop this assertion, he argues that he did not *willfully* give false testimony because he was testifying based on his colloquial understanding of "ownership."

4

### A. Materiality

The threshold issue is the materiality of Mr. Fernandez-Barron's testimony about when he sold his BMW.

#### 1. The Standard for Reviewing the District Court's Conclusion on Materiality

The element of materiality involves "a mixed question of law and fact." *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (citation omitted). When a mixed question of law and fact primarily involves legal principles, we engage in de novo review. *Littlejohn v. Royal*, 875 F.3d 548, 558 n.3 (10th Cir. 2017), *cert. denied*, 139 S. Ct. 102 (2018).

Mr. Fernandez-Barron argues that materiality primarily involves a legal issue, which precludes deference to the district court's decision. For the sake of argument, we assume that Mr. Fernandez-Barron is right.

#### 2. The Effect of the Testimony on the Government's Theory Involving the Text Message

The standard for materiality is whether the false testimony bears "a natural tendency to influence or was capable of influencing the decision required to be made." *United States v. Allen*, 892 F.2d 66, 67 (10th Cir. 1989). This standard is "conspicuously low." *United States v. Bedford*, 446 F.3d 1320, 1326 (10th Cir. 2006) (quoting *United States v. Dedeker*, 961 F.2d 164, 167 (11th Cir. 1992)).

The government's evidence against Mr. Fernandez-Barron included text messages and records of telephone calls between Mr. Fernandez-

Barron and other members of the conspiracy. Many of the messages and calls corresponded with the arrival dates of cocaine deliveries. For example, shortly before one delivery of cocaine, Mr. Molina-Villalobos texted Mr. Fernandez-Barron (in Spanish): "Where do we pick up the BMW, Buddy?" R. vol. I, at 165.

| | Declarant | Date | Time | Source |
|---|---|---|---|---|
| 29 | Keneth MOLINA-VILLALOBOS | 5/30/2014 | 4:31 PM | Keneth MOLINA-VILLALOBOS's cell phone (720-425-2445) (SW_00006402) |
| **Statement:** Text message from Keneth MOLINA-VILLALOBOS to Carlos FERNANDEZ-BARRON (303-720-1679): "Donde recojamos el BMW Compa" (English translation: "Where do we pick up the BMW, Buddy?") | | | | |

The government's expert witness explained that the text message constituted code to pick up a car full of cocaine—not to pick up an actual BMW. But the expert witness conceded that his explanation would be undermined if Mr. Fernandez-Barron had been conducting a transaction involving an actual BMW.[3]

Mr. Fernandez-Barron later testified that

_____

[3] The expert witness testified:

> Q. Well, let's put it in a more practical context. So if I understand what you are saying, if you had more information that delineated a -- the existence of this car, and some background or basis for the car, it was a real car, it was being bought and sold, that could influence your conclusion, couldn't it?
>
> A. Sure. regarding this specific exchange, if there was, in fact, a BMW that was transacted between these individuals, at that time, that would absolutely affect that specific text-message exchange. Yes.

R., vol. III, at 1270.

6

- he had owned a BMW,

- he had sold it to Mr. Lucio Lozano in May 2014, and

- the text message had related to this sale, not to a delivery of cocaine.

This testimony directly rebutted the government's evidence linking Mr. Fernandez-Barron to the delivery of cocaine in May 2014.

The district court ultimately found that Mr. Fernandez-Barron's testimony was false because he hadn't sold his BMW until September 2014, and the sale was to a dealership rather than to Mr. Lozano. The court regarded the circumstances of the sale as material, reasoning that Mr. Fernandez-Barron's testimony could influence the jury's interpretation of the text message.

### 3. Mr. Fernandez-Barron's Arguments

Mr. Fernandez-Barron contends that the circumstances of the sale were immaterial, pointing to (1) the weakness of the government's evidence on code words and (2) the district court's later findings.

### a. Weakness of the Government's Evidence on Code Words

Mr. Fernandez-Barron contends that the government's evidence on code words was so weak that his testimony could not have influenced the jury. This contention overstates the burden for materiality. "[F]or testimony to be material, 'it need not have an actual effect; it merely must be capable of influencing the [jury].'" *United States v. Hasan*, 609 F.3d

7

1121, 1140 (10th Cir. 2010) (quoting *United States v. Girdner*, 773 F.2d 257, 259 (10th Cir. 1985)). Regardless of the strength of the expert witness's testimony, it linked Mr. Fernandez-Barron to the conspiracy. And if the court had credited Mr. Fernandez-Barron's testimony about the sale of his BMW, that testimony would have pulverized this link to the conspiracy. Mr. Fernandez-Barron's testimony could thus affect the jury's finding on when he had entered the conspiracy.

Given this potential effect on the findings, Mr. Fernandez-Barron's testimony was material regardless of the alleged weakness of the government's evidence involving the text message.

### b.    Impact of the Court's Findings on Materiality

Mr. Fernandez-Barron also relies on the court's later findings to prove immateriality of his testimony about the BMW. Those findings related to the timing of Mr. Fernandez-Barron's entry into the conspiracy.

The district court ultimately found, for sentencing purposes, that Mr. Fernandez-Barron hadn't joined the conspiracy until March 2015—nearly a year after he received the text message about the BMW. Mr. Fernandez-Barron argues that the district court's finding rendered the BMW testimony immaterial. We disagree.

Materiality is based on the circumstances existing when the defendant gave the false testimony, not the circumstances that developed later. *United States v. Allen*, 892 F.2d 66, 68 (10th Cir. 1989). When Mr.

8

Fernandez-Barron testified, neither the jury nor the judge had made a finding on Mr. Fernandez-Barron's participation in the conspiracy. Without a finding, the jury was free to consider whether he had entered into the conspiracy any time from December 2013 to September 2015. So when Mr. Fernandez-Barron testified that he had sold the BMW in May 2014, this testimony could have led the jury to find that he hadn't yet joined the conspiracy;[4] the court's later finding could not diminish the materiality of Mr. Fernandez-Barron's BMW testimony when it was given.

## B.    Willful Falsity

Mr. Fernandez-Barron also argues that if his explanation had been a lie, it would have foolishly tied him more closely to the ringleader of the drug ring, Mr. Lozano. For this argument, Mr. Fernandez-Barron does not specify which element he is rebutting; we assume that the argument relates to willfulness.

However the argument is framed, it mistakenly assumes that Mr. Fernandez-Barron hadn't already exposed his connection to Mr. Lozano. But before Mr. Fernandez-Barron testified, defense counsel had already

---

[4]    Mr. Fernandez-Barron argues that the load in May 2014 was not a material issue at trial because the government had not lodged a charge based on that load. But Mr. Fernandez-Barron's involvement in that load could have affected the timing of his entry into the conspiracy, and the superseding indictment alleged that he had entered into the conspiracy in December 2013. So Mr. Fernandez-Barron's involvement in a load in May 2014 could support the government's allegation that he had entered into the conspiracy as early as May 2014.

said in his opening statement that Mr. Lozano was a client of Mr.
Fernandez-Barron's car-repair business:

> Now, understanding that during this time Mr. Licon is also kind of going back and forth to Mexico, and so when he is back here, they are connecting. And so, at this -- and then Licon also owned a transmission shop in 2010 about this time, and [Mr. Fernandez-Barron] would work out of that shop, and it was at that shop that he met Mr. Lozano. And Mr. Lozano. would come in, he would check out cars, and eventually he asked [Mr. Fernandez-Barron] to do work for him.

> He asked [Mr. Fernandez-Barron] to help him fix cars, and [Mr. Fernandez-Barron] saw that as a good business opportunity. Lozano was a good client. So he helped him with his cars.

R., vol. III, at 1281.[5] So Mr. Fernandez-Barron's testimony did not suggest a stronger connection to Mr. Lozano than defense counsel had already highlighted in his opening statement.

Nor did Mr. Fernandez-Barron's explanation suggest any criminality. To the contrary, his explanation distanced himself from the conspiracy as someone who had just worked on Mr. Lozano's cars and sold him a BMW.

We thus have little reason to disturb the district court's findings based on Mr. Fernandez-Barron's argument that a lie would have foolishly tied him more closely to Mr. Lozano.

---

[5]     Elsewhere in his opening statement, defense counsel discussed Mr. Fernandez-Barron's painting of Mr. Lozano's Silverado and work with Mr. Lozano on a Ford Raptor. R., vol. III, at 1282.

10

## IV.   Perjury Regarding the Impala

The district court also found that Mr. Fernandez-Barron had committed perjury when testifying about his Impala. The government presented testimony suggesting that (1) an Impala had been involved in a drug transaction in Kansas City and (2) Mr. Fernandez-Barron had an Impala registered under his name. So when he testified, he was asked about his connection to the Impala.

On direct examination, Mr. Fernandez-Barron quickly admitted that an Impala had been registered under his name; but he insisted that he did not consider himself the owner because he had sold the car to Mr. Licon-Gallegos. On cross-examination, Mr. Fernandez-Barron adhered to this distinction between registration and ownership. The district court ultimately disbelieved Mr. Fernandez-Barron and found that he had committed perjury when denying ownership of the car.

Mr. Fernandez-Barron argues that his testimony about the Impala was neither willfully false nor material. We reject both arguments.

### A.   Willful Falsity

The district court found that the testimony about the Impala was willfully false based on doubts about Mr. Fernandez-Barron's credibility and his experience in buying and selling cars:

> My reaction to [Mr. Fernandez-Barron's argument] is that it's unmitigated nonsense. First, the plates to the Impala are in his name. The explanation for that, which isn't an explanation, as to

11

how you go and get plates for a car, without a title, or a bill of sale or some indicia of ownership, I doubt that I could go to the D.M.V., Mr. McNeilly [government counsel], and say that I'm going to get plates for your car, without something indicating some right or title it to that car. But putting that to the side, the answer---the explanation was, it wasn't an issue for him to ask me to get plates. That simply is not an answer.

. . . If you are in the business in the dealing of automobiles, you know what titles are. You know how these documents work. You have to know, if you're buying and selling them, as he is doing on a regular basis, as part of his job.

The notion that, as he said at the trial, he didn't know what perjury meant. Also said that he didn't – he understood the word owner to mean the person who puts the plates on, drives the car and perhaps pays for it, that that's what an owner meant to him. That is simply unbelievable that the documents he swears under penalty of perjury, that he is the owner, and comes up with these fanciful explanations for he didn't really know what the word owner meant. He didn't really know what the word perjury meant. . . . [I]t's just too much. It's beyond the pale.

R., vol. III, at 1652–53. We review this finding for clear error. *United States v. Hammers*, No. 18-7051, ___ F.3d ___, 2019 WL 5876843, at *9 (10th Cir. Nov. 12, 2019).

As Mr. Fernandez-Barron argues, he quickly admitted that the car was registered in his name; this part of the testimony didn't constitute perjury. But Mr. Fernandez-Barron repeatedly insisted that he didn't consider himself the car's owner.

When pressed on cross-examination, Mr. Fernandez-Barron admitted that he had signed documents swearing to ownership of the Impala after allegedly selling the car to Mr. Licon-Gallegos. Mr. Fernandez-Barron also

12

acknowledged that registration made him the legal owner. But Mr. Fernandez-Barron explained that his colloquial concept of ownership had created confusion about the documents and the questions posed in cross-examination.

Despite his assertion of confusion, Mr. Fernandez-Barron had signed documents under penalty of perjury stating that he owned the Impala. And he often bought and sold cars, which could suggest familiarity with state laws governing ownership.

Were we the fact-finder, we might have credited Mr. Fernandez-Barron's testimony that he'd been confused. But the question is not what we would have found. The question is whether the district court committed clear error. *See* Part IV(A), above. Given Mr. Fernandez-Barron's sworn statements about ownership and his experience in buying and selling cars, the district court could reasonably find that Mr. Fernandez-Barron had known that he was the owner and had been lying when he professed confusion over the questions about ownership. The district court's finding on willful falsity thus did not constitute clear error.

## B. Materiality

The district court also regarded this testimony as material. Mr. Fernandez-Barron argues that the testimony was not material because

- he had been extensively cross-examined on his connection to the Impala,

13

- the Impala evidence was so weak that any false testimony could not have influenced the jury,

- his ownership of the car had little bearing on his guilt, and

- the district court's later findings rendered the testimony immaterial.

We reject each argument.[6]

### 1.    Extent of Cross-Examination

As discussed above, the government pressed Mr. Fernandez-Barron on cross-examination about his denial of ownership. In his reply brief, he contends that this cross-examination drained the impact from his

---

[6]    The parties have briefed materiality of the Impala for two separate incidents. The first incident involves Ms. Mota's identification of Mr. Fernandez-Barron in Kansas City. The second incident involves Mr. Fernandez-Barron's presence at a stash house near Denver. The district court's explanation of materiality relied on the second incident.

But Mr. Fernandez-Barron urges us to treat materiality as a question of law with no deference to the district court's decision. *See* Part III(A)(1), above. We can thus base materiality on the Kansas City incident even though the district court had discussed materiality for a different incident. *See United States v. Haas*, 171 F.3d 259, 268 (5th Cir. 1999) ("Although the district court made no explicit findings as to the materiality of the perjurious statements, it is clear to us, as a matter of law, that those statements were material."); *United States v. May*, 568 F.3d 597, 607 (6th Cir. 2009) ("While the district court did not rule that each of these statements was material [for purposes of the enhancement in § 3C1.1], we will not remand a case back to the district court solely for a finding as to materiality because we may answer such a question for ourselves.").

Based on the Kansas City incident, we conclude that the false testimony was material. We thus need not discuss the district court's reliance on the incident at the stash house.

14

distinction between registration and ownership. This contention was waived and is invalid.

Mr. Fernandez-Barron waived the argument by omitting it in his opening brief. He did present this argument in his reply brief. There he stated that he was continuing an argument from pages 18–19 of his opening brief. But on those pages in the opening brief, he was simply quoting trial testimony with no legal argument. This argument does not appear in the opening brief, and raising the argument in the reply brief was too late. *United States v. Duran*, 941 F.3d 435, 2019 WL 5212198, at \*5 n.3 (10th Cir. 2019).

Even if Mr. Fernandez-Barron had properly presented this argument in his opening brief, it would be invalid because it uses the wrong time period to gauge materiality. We gauge the materiality of false testimony when it was given, not with the gloss of later information. *See United States v. Allen*, 892 F.2d 66, 68 (10th Cir. 1989) ("The materiality test is determined at the time and for the purpose for which the allegedly false statement was made."). So if someone lies on direct examination and admits the lie on cross-examination, the original lie doesn't become immaterial with the later admission. *See United States v. Norris*, 300 U.S. 564, 574 (1937) (concluding that perjury is not cured by a later truthful disclosure because "the oath administered to the witness calls on him freely to disclose the truth in the first instance and not to put the court and

15

the parties to the disadvantage, hinderance, and delay of ultimately extracting the truth by cross-examination").

For this argument, Mr. Fernandez-Barron cites *United States v. Langston*, 970 F.2d 692 (10th Cir. 1992). The issue there was the effect of the government's failure to correct a witness's false testimony on direct examination. In addressing this issue, we concluded that the allegedly false testimony was immaterial because the witness had fully acknowledged the facts on cross-examination. *Langston*, 970 F.2d at 700–701.

Drawing on this conclusion, Mr. Fernandez-Barron argues that any false testimony about the Impala became immaterial because of his statements on cross-examination. But *Langston* does not support this argument. The *Langston* court examined whether the defendant had been deprived of due process, and the test for materiality was identical to the test for harmless constitutional error. *Id.* at 700.

One could conceivably apply *Langston* to conclude that Mr. Fernandez-Barron's false testimony about the Impala had not contributed to the conviction because his underlying lie had been exposed on cross-examination. But in assessing whether the district court had erred in applying the enhancement, the Court doesn't gauge materiality by determining whether the false testimony had contributed to the verdict. *See* Part III(A)(3), above. So *Langston* sheds little light on the materiality of Mr. Fernandez-Barron's testimony.

16

When he testified falsely about the Impala, his connection to the car hadn't been decided. If his connection to the Impala was material at that time, the perjury wouldn't vanish with a later revelation during cross-examination.

**2.   Weakness of the Government's Evidence Tying Mr. Fernandez-Barron to the Impala**

Mr. Fernandez-Barron argues that the government's evidence about the Impala was so weak that any false testimony could not have influenced the jury. To evaluate this argument, we consider the government's evidence tying Mr. Fernandez-Barron to the Impala.

The government argued that one of the load drivers, Ms. Martha Mota, had seen Mr. Fernandez-Barron in Kansas City when he drove up in an Impala. According to the government, Mr. Fernandez-Barron owned the Impala.

Ms. Mota's identification of Mr. Fernandez-Barron was weak. She testified that the man she had seen in the Impala was the man depicted in a photograph of Mr. Fernandez-Barron. But during the trial, she couldn't recognize Mr. Fernandez-Barron as one of the men that she had seen in the Impala. She was equally unsure about whether the car was an Impala. She thought that it looked like a police car and guessed that the car was an Impala.

But the government continued to advance its theory that the car Ms. Mota had seen was Mr. Fernandez-Barron's Impala. R., vol. III, at 1558–59, 1564 (government's rebuttal closing argument). So when Mr. Fernandez-Barron testified, he had no way of knowing what the jury would ultimately find. *See* Part III(A)(3)(a), above. Given this uncertainty, his false testimony about ownership of the Impala was material.

**3.    Use of the Impala**

Mr. Fernandez-Barron also contends that ownership doesn't matter because Ms. Mota's testimony was based on use of the Impala (not ownership). Even if Mr. Fernandez-Barron did not own the car, Ms. Mota could have still seen him in Kansas City. But ownership tied Mr. Fernandez-Barron more closely to the Impala, and his efforts to distance himself from the car weakened the government's theory that he had met Ms. Mota in Kansas City.

Indeed, in his opening statement, defense counsel had underscored the eventual distinction that Mr. Fernandez-Barron would later draw in his testimony between registration and his colloquial concept of "ownership":

> The Impala is registered to Mr. Fernandez-Barron, but it's actually owned by Licon-Gallegos, because at the time, Mr. Fernandez-Barron's belief that Licon-Gallegos didn't have a license, and so he couldn't register the car, so he registered it for him.

R., vol. III, at 1284. And, of course, Mr. Fernandez-Barron pointedly testified on direct examination that he had relinquished ownership of the

18

Impala in February 2013—long before Ms. Mota saw the car in Kansas City. So if Mr. Fernandez-Barron lied about ownership, he would have been lying about a factual issue that his own counsel thought material enough to inject into the trial.

### 4.    The District Court's Later Findings

Mr. Fernandez-Barron also challenges the finding of materiality based on the district court's later finding that he had joined the conspiracy in March 2015, long after the Kansas City incident with Ms. Mota. According to Mr. Fernandez-Barron, the later finding renders the Impala testimony immaterial.

We disagree. When Mr. Fernandez-Barron testified, the date of his entry into the conspiracy involved an open issue for the jury and the judge to decide. So the court's later finding couldn't affect materiality of the testimony when it was given. *See* Part III(A)(3)(b), above.

## V.    Conclusion

We conclude that the district court did not err in applying the enhancement for obstruction of justice. Mr. Fernandez-Barron's false testimony about the BMW directly contradicted the government's theory tying him to the conspiracy in May 2014. The court thus did not err in determining that his testimony about the BMW was willfully false and material.

Nor did the court err in finding perjury for his testimony about the Impala. Ms. Mota testified that the man she had seen had a car that looked like an Impala and identified Mr. Fernandez-Barron from a photograph. To counter this identification, Mr. Fernandez-Barron testified that he hadn't even owned an Impala. Given his testimony and Ms. Mota's, the district court did not err in determining that Mr. Fernandez-Barron had willfully given false and material testimony about ownership of the Impala.

We thus conclude that the district court did not err in finding perjury for both the BMW and the Impala testimony. Given these conclusions, we affirm the sentence.