**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**March 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

OTIS RAY WHITEHEAD, JR.,

Defendant - Appellant.

No. 24-6062
(D.C. No. 5:23-CR-00280-J-1)
(W.D. Okla.)

_____

## ORDER AND JUDGMENT[*]

_____

Before **MORITZ**, **EID**, and **FEDERICO**, Circuit Judges.

_____

Otis Ray Whitehead, Jr., appeals his conviction and sentence on one count of

being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm.[1]

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Judge Federico joins this Order and Judgment except for Part II.B.

## I.  Background

Whitehead was the subject of an investigation by the Oklahoma City Police Department ("OCPD").  In March 2023, OCPD officers executed a search warrant at a two-bedroom residence located at 2237 Northwest 32nd Street in Oklahoma City.  There, officers found Whitehead, his brother Tylin Childers, three of Whitehead's teenage nephews, and Whitehead's teenage sister.  A search uncovered a handgun in the pocket of a jacket hanging over a closet door in one of the bedrooms.  They arrested Whitehead and Childers, each of whom had prior felony convictions.

The Government charged Whitehead with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  The jury found Whitehead guilty.  The district court applied a sentencing enhancement for obstruction of justice and sentenced Whitehead to 87 months of imprisonment.  Whitehead appeals.

## II.  Discussion

Whitehead raises three issues on appeal, challenging (1) the sufficiency of the evidence, (2) the enhancement for obstruction, and (3) the constitutionality of § 922(g)(1).  We address the issues in order.

### A.    Sufficiency of the evidence

#### 1.    Standard of review

"We review the sufficiency of the evidence to support a conviction de novo to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the

crime beyond a reasonable doubt." *United States v. Stepp*, 89 F.4th 826, 831–32 (10th Cir. 2023) (internal quotation marks omitted). "In conducting this review, we consider all of the evidence, direct and circumstantial, along with reasonable inferences, but we do not weigh the evidence or consider the relative credibility of witnesses." *Id.* at 832 (internal quotation marks omitted). "Thus, our review is limited and deferential; we may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

### 2. Constructive possession principles

To convict Whitehead "under § 922(g)(1), the Government had to prove, among other things, that he knowingly possessed . . . a firearm." *Id.* (internal quotation marks omitted). Although "[p]ossession may be actual or constructive," *id.*, there is no dispute that this case involves only constructive possession. "Constructive possession exists when a person, not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object." *Id.* (brackets and internal quotation marks omitted). "When a defendant has exclusive control over the premises where an object is found, a jury may infer constructive possession." *Id.* (internal quotation marks omitted). "But when a defendant jointly occupies the premises, the Government must show a nexus between the defendant and the firearm . . . ." *Id.* (internal quotation marks omitted). "That is, the Government must demonstrate the defendant knew of, had access to, and intended to exercise dominion or control over the contraband." *Id.* (brackets and internal

quotation marks omitted). "This may be proved by circumstantial as well as direct evidence." *Id.* (internal quotation marks omitted). "Multiple individuals may have constructive possession of the contraband; exclusive possession is not required." *Id.* at 833. "But the defendant's joint occupancy alone cannot sustain an inference of constructive possession." *Id.* (internal quotation marks omitted).

### 3. Whitehead's argument

Whitehead concedes that "the Government presented ample evidence that [he] knew about the gun and had access to it," but argues that "nothing presented to the jury supports a finding he intended to exercise control over it." Aplt. Opening Br. at 25. He contends the evidence is insufficient to support the Government's claim that the bedroom where the gun was found was solely his because at the time of the search, his sister was sleeping in there. He argues that at most, the evidence showed he jointly occupied that bedroom.

We disagree. We first summarize the relevant evidence and then explain why it was sufficient to support the conviction.

### 4. Trial evidence

Officer Harmon was the lead officer conducting the search. At trial, he testified that when he entered the house, he saw Whitehead at the back of the living room and "ordered [Whitehead] out," but Whitehead "did not comply." R. vol. III at 29:7. Whitehead then "ducked around the corner to the west and then later came back out into the living room." *Id.* at 29:8–9. The area he "ducked into" contained the southwest bedroom where the gun was found. *See id.* at 29:11–13; *see also id.*

4

at 33:10 (describing the bedroom where the gun was found as the "southwest bedroom"). Whitehead returned to the living room in "a matter of seconds." *Id.* at 45:19. Childers then emerged from the other bedroom. *See id.* at 32:2–10. There were also three teenagers who had been asleep on the living room couch, *see id.* at 29:16–17, 20–21, and "a female occupant asleep in the [southwest] bedroom," *id.* at 45:22.

After police removed all the occupants out of the house, they began to search it. They found Childers's property in the northeast bedroom. *Id.* at 32:22–24. Whitehead testified at trial that Childers was living at the house. *Id.* at 113:14–18. In the southwest bedroom, police found the following evidence: (1) a handgun sticking out of the pocket of a black jacket hanging over the closet door and a blue jacket hanging in the same closet with "a name patch on it that [said] 'Otis,'" *id.* at 35:6–15; (2) male clothing on the floor, *see id.* at 34:19–20; (3) "a letter addressed to Otis Whitehead at 2237 Northwest 32nd Street in Oklahoma City," which was the address of the house, and "dated 16th of December, 2022," *id.* at 34:10–12, which was several months before the arrest; (4) a letter addressed to Whitehead at 3008 Hillsdale Drive, *see id.* at 48:2–10, which is where Whitehead claimed he lived with his wife and children, *see id.* at 113:20–21; and (5) two documents bearing the name of Whitehead's twin brother, Otris Whitehead, *see id.* at 46:9 to 47:3. Police did not find any female clothing in the southwest bedroom. *See id.* at 35:2–3.

Officer Harmon testified that when asked, Whitehead told police that his address was "2237 Northwest 32nd Street in Oklahoma City." *Id.* at 38:5–10. When

confronted with this admission at trial, Whitehead said, "It was early that morning. They scared me." *Id.* at 120:23–25. When asked if he "gave [that] address to police as [his] residence," Whitehead claimed he could not "recall . . . because that's not my residence." *Id.* at 121:5–8. Whitehead testified that he had arrived at the house around 1:00 or 2:00 in the morning to visit his brother and play video games with his nephews and that he goes there "twice a week, or whenever [Childers] call[s]." *Id.* at 114:6–20.

The Government played for the jury a police patrol car video recording that captured a conversation between Whitehead and Childers while they were sitting in the back of the police car just after their arrest. The jury heard:

Childers:  "Where was it at?"

Whitehead:  "What?"

Childers:  "Pistol."

Whitehead:  "Ah bro that motherfucker was in the jacket in *my room*."

Childers:  "They probably got it. I don't know."

Whitehead:  "Hell yeah, they had to get it."

Suppl. R. vol. 1 at 1:14 to 1:19 (emphasis added); *see also* R. vol. III at 125:17–25, 127:14–18, 128:12–15 (Whitehead testimony confirming what he says on the video recording).

At trial, Whitehead admitted he said that the room where the gun was found was his, but he explained "that's not my room. I said 'my room,' but when I go over there, that — you could just say 'my room,' like, that's where I go, like, that's where

6

my little brother be at.  If I do anything, like, I will put my jacket or something in there." *Id.* at 128:19–23.  When asked if the "gun [was] hanging out of the pocket . . . because [he] didn't have time to hide it better when [he] ran into that hallway from police," *id.* at 130:3, 9–10, Whitehead answered, "No," *id.* at 130:11.

Childers also testified at trial.  He said that he and Whitehead did not know what police had found in the house until they "got downtown." *Id.* at 62:5.  But when the prosecution asked Childers if he made a jailhouse phone call on the day of the arrest during which he said he was upset Whitehead had brought the gun to the house, Childers said he could not recall.  *See id.* at 62:25 to 63:4.  The prosecution then played a recording of the call to impeach Childers's testimony.  Afterwards, the following exchange occurred:

> Q (By [prosecutor])  Mr. Childers, you were upset that your brother had
> that gun.
>
> A  I don't even — I never said anything about a firearm in that phone call.
>
> Q  You said you didn't know why he had that shit with him?
>
> A  I don't know what that shit is.  I never knew what I went to jail for till I
> got down there.
>
> Q  You said you guys don't keep stuff like that there, that's your safe spot?
>
> A  Exactly.  What is it?  Why are we here?  I didn't know what we are
> down here for.  They never told us what we went to jail for.

*Id.* at 65:14–25.

After the recording of the call was played again, the prosecutor asked:  "[Y]ou also said, 'why he had it with him,' correct?" *Id.* at 67:12–13.  Childers responded: "Past tense.  We were already in jail." *Id.* at 67:14–15.  The prosecutor then asked:

"Mr. Childers, you were upset with your brother because he brought a gun to your safe spot?" *Id.* at 67:18–19. Childers answered: "I'm upset because they said we had something in our safe spot. They never told us what we were going to jail for." *Id.* at 67:20–21. When pressed, Childers testified that he "did not know" Whitehead had a firearm in the house. *Id.* at 68:7–11.

The defense called an OCPD forensic scientist as a witness. He testified that DNA testing of the gun and the black jacket was inconclusive because it detected a mixture of DNA from at least three individuals on the gun and from at least four individuals on the jacket. *See id.* at 96–97.

Lesley Gill also testified for the defense as follows: She had purchased the gun in question in February 2023. *See id.* at 102:19 to 103:2. Shortly afterward, she was planning on moving, so she asked her daughter, Janishia Shockley, to hold on to some of her belongings, including the gun. *See id.* at 103:9–24; *id.* at 108:23–25. Gill did not see the gun again and did not know what happened to it until she was notified that it had turned up at the house where police found it. *See id.* at 108:10–12; *id.* at 109:2–4. She thought Shockley had dated Childers, *see id.* at 106:22–24, and she did not know Whitehead, *see id.* at 104:17–18.

Whitehead testified that Shockley was Childers's girlfriend and lived at the house. *See id.* at 115:22–24; *id.* at 116:5–18. Whitehead claimed that Shockley brought the gun into the house. *See id.* at 116:25 to 117:5; *id.* at 129:1–4. He admitted he had several felony convictions. *See id.* at 117:18 to 118:9. He denied ever carrying, using, or possessing the gun. *See id.* at 117:6–9; *id.* at 118:10–12. But

8

he knew the gun was unloaded. *See id.* at 117:15–17; *id.* at 129:5–6. He presented utility bills with his name and the 3008 Hillside Drive address where he claimed he lived with his wife, dated several months after his arrest. *See id.* at 119:1–19; *id.* at 121:12–18. He denied he ever "ducked down that hallway" when police entered the house. *Id.* at 122:19–20. He admitted that the jacket with the "Otis" name patch was his. *See id.* at 129:7–13 (asking Whitehead about Government Exhibit 13, which is a picture of the "Otis" jacket, *see* Suppl. R. vol. II).[2] He knew Gill was Shockley's mother but did not know Gill. *See id.* at 130:19–21.

## 5. Analysis

The foregoing evidence, viewed in the light most favorable to the Government, was sufficient for the jury to find that Whitehead intended to exercise dominion or control over the gun. The jury reasonably could have found that, contrary to Whitehead's testimony, he in fact ducked out of sight for a few seconds toward the

---

[2] The Government argues that Whitehead's testimony here was an admission that the black jacket where the gun was found was his. But plainly the Government is mistaken because Government Exhibit 13 is a picture of the "Otis" jacket. The Government also argues that Whitehead made the same admission at two other points in his testimony. Our review of those portions of the testimony indicates that Whitehead made no such admission. In the first portion, the prosecutor asked: "So — and that black jacket, that was hanging in that room where your stuff was, right?" R. vol. III at 125:1–2. Whitehead asked: "Where my jacket was?" *Id.* at 125:5. The prosecutor then said "Yes," and then Whitehead said "Yes." *Id.* at 125:6–7. The prosecutor then asked: "And there's a gun in that jacket, right?" *Id.* at 125:8. Whitehead said "Yes." *Id.* at 125:9. We read this exchange as admitting that the gun was in the black jacket in the room where Whitehead's "Otis" jacket was, not as an admission that the black jacket was his. In the second portion of Whitehead's testimony that the Government points to, Whitehead confirmed that, in the patrol car, he said to Childers that the gun "was in the jacket." *Id.* at 127:16. He did not say that the jacket where the gun was found was his.

southwest bedroom where the gun was found and that it was hanging out of the black jacket's pocket because he did not have time to hide it better. This alone would have been sufficient evidence to support the required finding, particularly given that Whitehead, a convicted felon prohibited from possessing a gun, had motive to hide the gun. *See United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996) ("The kind of evidence that can establish dominion and control includes, for example, evidence that the defendant attempted to hide or to destroy the contraband . . . .").

But there is more. The jury could have reasonably found the southwest bedroom and the black jacket were Whitehead's, at least on the day the gun was seized if not every time he visited, based on (1) his statement, captured on the police car video, that it was his room; (2) his testimony that when he visits, "that's where I go. . . . If I do anything, like, I will put my jacket or something in there." R. vol. III at 128:21–23; and (3) the other physical evidence found in the room—the "Otis" jacket, additional male clothing (but no female clothing), and the letter addressed to Whitehead at the house's address. Finally, the jury reasonably could have found that Whitehead intended to exercise dominion and control over the gun based on the impeaching phone call in which Childers said he was upset that Whitehead had brought the gun to their "safe spot," *id.* at 67:20–21. Although Childers claimed that, when he made the call, he did not know what the police were charging them with or that Whitehead had brought the gun to the house, the jury could have readily found that effort not credible based on the evasiveness of his answers to the prosecutor's questions and his own question to Whitehead, as they sat in the patrol car—which

10

was prior to the impeaching phone call—about the status of the "[p]istol," Suppl. R. vol. 1 at 1:15.

In sum, the evidence was sufficient to support the conviction, and the jury did not need to resort to impermissible "speculation and conjecture that render[ed] its finding a guess or mere possibility," *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995) (internal quotation marks omitted).

## B.    Obstruction of justice enhancement

Whitehead argues that the district court erred in imposing a two-level enhancement for obstruction of justice pursuant to United States Sentencing Guideline § 3C1.1 based on a finding that he perjured himself at trial by testifying he did not try to get Shockley to take responsibility for the gun.  We reject his argument.

Section 3C1.1 of the United States Sentencing Guidelines requires a two-level upward adjustment to a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1 (2021).[3]  Perjury can be the basis for such an enhancement.  *Id.* § 3C1.1 cmt. 4(B).  "To establish perjury, a district court must conclude the defendant (1) gave false testimony under oath, (2) about a material matter, and (3) the false testimony was willful and not the result of confusion, mistake or faulty memory."  *United States v. Fernandez-Barron*, 950 F.3d 655, 657 (10th Cir. 2019)

---

[3] The computation of Whitehead's sentence was based on the 2021 edition of the Sentencing Guidelines.

11

(internal quotation marks omitted).  Where, as here, "a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition."  *United States v. Hawthorne*, 316 F.3d 1140, 1145 (10th Cir. 2003) (internal quotation marks omitted).

"In assessing the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error."  *Fernandez-Barron*, 950 F.3d at 658 (internal quotation marks omitted).  "A finding of fact is clearly erroneous only if it is without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made."  *United States v. Craine*, 995 F.3d 1139, 1157 (10th Cir. 2021) (internal quotation marks omitted).

At trial, the Government asked Whitehead if he knew that the gun "was registered to [Gill] and [he] tried to get her daughter, Janishia Shockley, to take responsibility for [it]?"  R. vol. III at 130:25 to 131:2.  Whitehead acknowledged that the gun was "not registered to . . . Shockley," *id.* at 131:6–7, but denied that he had tried to get Shockley to take responsibility for it.  The Government then asked Whitehead if he had placed "video calls" from jail to his friend, "Hatashia Bowman," and suggested that the purpose of those calls was "to try to get her to get . . . Shockley to take responsibility for that gun."  *Id.* at 131:12–13, 20–22.  As to the first call, Whitehead said he just wanted Shockley "to meet up with [his] lawyer to say

12

why that gun was even there." *Id.* at 131:23–24.  To impeach Whitehead, the

Government played the video recording of the first call, after which the following

exchange took place:

> Q (By [prosecutor])  You-all thought because her wifi was hooked up there, you would be able to prove that was her gun, right?
>
> A  No, that's the reason why the gun is there.
>
> Q  You needed someone to claim that Janishia stayed there?
>
> A  No, I needed Janishia, but she don't like this stuff, but why that gun was there.
>
> Q  You started to talk about how this was going to happen —
>
> . . .
>
> Q  And then you said, "Have Little South do it."  That's — Little South is Tylin Childers?
>
> A  His girl — yeah, to have him — to have his girlfriend meet up with my lawyer so this can not be — because I didn't try to possess or I didn't intend to do anything with that gun.  That is her gun.  The only reason that gun was over was because she brought it because her mom was moving.

*Id.* at 133:15 to 134:6.[4]

The Government then asked Whitehead whether, in a second video call to

Bowman he placed later the same day as the first call, he tried "to get Janishia to take

responsibility for the gun," *id.* at 134:15–16, suggesting that Whitehead "needed

Ms. Bowman to help [him] get Janishia on board with [his] plan," *id.* at 134:25 to

135:1.  Whitehead replied:  "No, I needed her to tell the truth.  If you listen to any of

---

[4] The video calls were not introduced into evidence and are not part of the record on appeal, so we base our review on the substance of those calls as portrayed through the Government's questions and Whitehead's answers.

my calls, I say I need Janishia to come tell the truth." *Id.* at 135:2–3. The

Government then played the second video call, after which the following exchange

took place:

> Q (By [prosecutor])  You wanted to know if she was okay with this, didn't
> you?
>
> A  Yeah, going to get — going to make sure that Janishia meets up with my
> lawyer.
>
> Q  You said, "It ain't even a lie," and then you laughed?
>
> A  It ain't a — like, it ain't a lie I need you to do this.  I need this done so
> —because y'all saying I'm trying to possess something or intent to possess
> something and I don't — I didn't even bring or nothing, other — the gun
> wouldn't have been there if it wouldn't for Janishia mom moving.
>
> Q  And after you said, "It ain't even a lie," you laughed again and said,
> "I'm just playing."
>
> A  I'm just trying — I was just trying to get Janishia to do what was — if
> you listen to those, I'm saying just tell her — what I need to talk to her, I'd
> tell her, just come tell the truth.
>
> Q  And then next you said, "But do you got this."
>
> A  Yeah, having Janishia, yeah, do what she — get her bill to show that she
> lived there, show that she brought it over there and everything, like do
> what's true, do what's right.

*Id.* at 135:17 to 136:11.

The Government then asked Whitehead if, in a third call made a couple of

months later, Whitehead "demanded to talk to Janishia." *Id.* at 136:22.  Whitehead

agreed that he had.  The Government then played the video call, which showed both

Bowman and Shockley on the receiving end, after which the following exchange took

place:

14

Q (By [prosecutor])  Mr. Whitehead, you wanted to know if it was true that Janishia was not going to take the rap for you?

A  She gets mad at my brother and then wanted her not to do it.  Instead of just coming to tell the truth, I told her she can't —

Q  Many of my questions require a simple response, okay, so please respond to the question that is asked.

A  Yes, sir.

Q  And the question that I asked you is that you wanted to know whether or not it was true that she was not going to claim this gun, yes or no?

A  That's not it.

Q  Okay.  And then Ms. Bowman tried to explain why she wouldn't do it and you quickly cut her off, didn't you?

A  No, that's not it.

Q  You said, "we didn't" — you didn't want to talk on this phone about it, did you?

A  No, I didn't, because —

Q  Because you knew the call was recorded?

A  Yes.  And I wanted her to just go tell the truth, not nothing else.

Q  Mr. Whitehead, you didn't want Janishia's reasons about why she wouldn't do that for you recorded on a jail call —

A  No, I was getting frustrated because I didn't know the reason because her and my brother probably argued and she, I'm not going to be around your brother, you know, is a typical relationship.

Q  Mr. Whitehead, if this was her gun and you didn't possess it, it shouldn't matter what she says on that recorded call.

A  Well, I guess not, but I was told not to talk about none of it because it could get me in trouble.

. . .

Q  (By [prosecutor])  You wanted to know whether or not she was going to take that responsibility and when they tried to explain, you quickly cut them off?

15

A  No.

Q  You cut them off because you knew the call was recorded and you knew Janishia would say something that would get you in further trouble?

A  No.

Q  You did not want to start talking about why you needed her to take responsibility for it?

A  No.

*Id.* at 137:20 to 138:25, 139:13–23.

At sentencing, the Government provided the district court with a transcript of these exchanges, relied on all of them, and specifically highlighted portions of the first and third exchanges. Whitehead's counsel argued that Whitehead "wasn't getting her to say things – or attempting to get her to say things that were untrue." *Id.* at 195:24–25. Instead, counsel argued, Whitehead "was trying to complete the story so we had the entire picture at trial through her testimony. That ultimately did not happen. But he was not putting words in her mouth. He was not telling her to say things that weren't already at least partly corroborated by the testimony of Ms. Gill." *Id.* at 196:1–5.

In ruling that the enhancement applied, the district court observed that Whitehead had testified under oath and found that "what was material in this instance was his – the testimony regarding the firearm registration and the ownership or possession or responsibility for that." *Id.* at 197:4–6. The court further found that "it appears from the transcript here defendant was less than forthcoming with respect to his conversations and exchanges with respect to Ms. Shockley and his effort to try to get her to take responsibility for that gun." *Id.* at 197:6–10. The court also did "not

16

believe, based on all that [it] recall[ed] and all that [it had] read [at the sentencing hearing] . . . that the testimony that Mr. Whitehead gave was the result of any confusion, mistake, or faulty memory." *Id.* at 197:11–14.

Whitehead first argues "'[t]he mere fact that a defendant testifies to his or her innocence and is later found guilty by the jury does not automatically warrant a finding of perjury.'" Aplt. Opening Br. at 28 (quoting *United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993)).  But the district court's explanation makes clear that the court did not impermissibly find Whitehead perjured himself simply because the jury found him guilty.

Whitehead also contends "the Government's argument the jail calls were attempts to shift blame to someone else is equally as plausible as Mr. Whitehead's explanation that he 'just wanted the truth,'" so it was clear error for the district court to find Whitehead perjured himself. *Id.* at 30.  We disagree.  The district court acted reasonably in interpreting the record as indicating that Whitehead had willfully lied when he testified that he never tried to get Shockley to take responsibility for the gun and that, in the video calls, he had attempted to shift possession or responsibility for the gun from Whitehead to Shockley.  Two aspects of the testimony are especially supportive of that interpretation:  (1) Whitehead's statement that "[i]t ain't even a lie," followed by him laughing and then saying, "I'm just playing," R. vol. III at 136:2–3 (internal quotation marks omitted); and (2) the evasiveness in his answers to the prosecutor's line of questioning regarding the third call, particularly those

17

concerning why he cut Bowman and Shockley off from explaining why Shockley would not take responsibility for the gun.

Whitehead maintains that he truthfully testified that the gun would not have been at the house but for Shockley bringing it there and he only wanted Shockley to say she had brought it there. But it was constructive possession—i.e., control—of the gun, not the reason for its mere presence at the house, that was at issue. Even if we were to agree with Whitehead that there were two "equally plausible interpretations of his testimony," Aplt. Opening Br. at 30, he cannot prevail on appeal. *See Craine*, 995 F.3d at 1157 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (brackets and internal quotation marks omitted)). The district court did not clearly err in finding that Whitehead perjured himself with respect to his efforts to deflect control of the gun from himself.

## C.    Constitutionality of § 922(g)(1)

Whitehead argues that § 922(g)(1) violates the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). He states that he raises this issue solely "for preservation purposes, since his Second Amendment challenge remains precluded by *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023)." Aplt. Opening Br. at 33. In *Vincent*, this court concluded that *Bruen* did not disturb Tenth Circuit precedent upholding the constitutionality of § 922(g)(1) without regard to "the type of felony involved." 80 F.4th at 1202. However, the Supreme Court vacated *Vincent* and remanded for consideration in light of *United States v. Rahimi*,

602 U.S. 680 (2024). *See Vincent v. Garland*, 144 S. Ct. 2708 (2024). On remand, this court concluded that *Rahimi* did not "undermine the panel's earlier reasoning or result." *Vincent v. Bondi*, 127 F.4th 1263, 1264 (10th Cir. 2025). The court therefore "readopt[ed]" its "prior opinion." *Id.* at 1266. Thus, even after *Rahimi*, this circuit holds that § 922(g)(1) does not violate the Second Amendment. Whitehead's argument, therefore, fails on the merits.

### III.  Conclusion

We affirm Whitehead's conviction and sentence.

Entered for the Court


Allison H. Eid
Circuit Judge

19