FILED
United States Court of Appeals
Tenth Circuit

June 23, 2026

Christopher M. Wolpert
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

———————————————————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LORI MILLIRON,

Defendant - Appellant.

No. 23-1217

———————————————————————

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:22-CR-00012-WJM-2)**

———————————————————————

Robert T. Fishman of Ridley, McGreevy & Winocur, P.C., Denver, Colorado, for Defendant-Appellant.

Marissa R. Miller, Assistant United States Attorney (J. Bishop Grewell, Acting United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

———————————————————————

Before **HOLMES**, Chief Judge, **PHILLIPS**, and **CARSON**, Circuit Judges.

———————————————————————

**PHILLIPS**, Circuit Judge.

———————————————————————

At doctors' appointments, museum tours, and freshman orientations, there are no bad questions. But when a prosecutor is the one asking and the answer carries a potential perjury charge, there are.

Lori Milliron testified before a federal grand jury that was investigating whether her paramour Larry Rudolph had murdered his wife. Armed with evidence that Rudolph had given Milliron tens of thousands of dollars in the two years before the murder, the government asked her why Rudolph had been so generous to her. She said she didn't know. And later, the government asked whether Rudolph had proclaimed his innocence to her when discussing the FBI's investigation into his wife's death. She said he "probably" did.

Based on Milliron's testimony before it, the grand jury indicted her for five counts of perjury, one count of accessory after the fact to foreign murder, and one count of obstruction of justice. A petit jury later convicted Milliron on two perjury counts, accessory, and obstruction.

On appeal, Milliron argues that her perjury convictions resulted from the prosecutor's imprecise questioning and were unsupported by sufficient evidence. She also challenges her accessory conviction as beyond the bounds of the accessory statute and her obstruction conviction as contrary to the Double Jeopardy Clause.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm all Milliron's convictions except for the first perjury count.

## BACKGROUND

I.    **Factual Background**

In 2003, Lori Milliron began working as a hygienist for dentist Larry Rudolph in Pittsburgh, Pennsylvania. By 2004, the two had begun an extramarital affair.

Milliron had long wanted Rudolph to divorce his wife, Bianca. But she understood Rudolph's worry that a divorce would harm him financially. And Rudolph's money mattered to Milliron too. Over the years, he'd helped pay for her house, car, and vacations, and he'd funded her children's housing, educations, and plastic surgeries. Milliron often asked Rudolph for money, and he always gave it to her.

In spring 2016, Bianca learned of Rudolph's affair with Milliron and demanded that he end it. So Rudolph could have either (1) divorced Bianca and kept seeing Milliron or (2) stayed married and ended his affair with Milliron.

But in October 2016, he chose a third option. He kept seeing Milliron and murdered Bianca while on safari in Zambia. To conceal the murder, Rudolph staged a scene in his and Bianca's private cabin to convince others that Bianca had accidentally shot herself in the heart. While still in Zambia, and before even telling his children about their mother's death, Rudolph had Bianca's body cremated. Zambian authorities investigated but found no wrongdoing. And stateside insurance investigators treated Bianca's death as accidental, paying Rudolph just under $5 million in life-insurance proceeds.

3

For her part, around April 2015, Milliron confided in one of her colleagues that she'd told Rudolph to "get rid of Bianca," take cash from the dental practice, and move out of the country. J. App. vol. 14, at 3467. And three months before the murder, while preparing for an earlier Zambian safari with Bianca, Rudolph had Milliron order—through the dental practice—five vials of propofol, a surgical sedative that "puts [people] to sleep." *Id.* at 3535. Before then, only the practice's contracted anesthetists, not the practice itself, stored and used propofol. Rudolph told an employee that he was taking the propofol "in case of an accident." *Id.* at 3510.

Within hours of shooting Bianca, Rudolph texted Milliron that there had been an accident. But he waited six days before telling anyone in his family. Milliron received Rudolph's text but never responded.

Less than two weeks after Rudolph returned from Zambia, and just two days after Bianca's funeral, Rudolph booked Milliron a one-way flight to join him at his and Bianca's house in Paradise Valley, Arizona. Within six months, Milliron moved in. Within the next two years, Rudolph drew more than a million dollars from Bianca's life-insurance proceeds to finance the construction of a $2.5 million Paradise Valley house for him and Milliron.

And by the time of her grand-jury testimony, Milliron knew that Rudolph killed Bianca. In January or February 2020, Rudolph and Milliron were dining at a Phoenix steakhouse where they were regulars. Just as a song ended, the bartender and customers seated nearby heard Rudolph in a very firm, harsh tone

4

say to Milliron: "I killed my fucking wife for you." *United States v. Rudolph*, 152 F. 4th 1197, 1211 (10th Cir. 2025) (citation modified), *cert. denied*, --- S. Ct. ----, 2026 WL 79716 (Jan. 12, 2026). Milliron gathered her purse, lowered her head, and left the restaurant. *Id.* at 1212. The bartender thought that Milliron seemed embarrassed but unsurprised. Rudolph left soon after, apologizing to the bartender on his way out.

Meanwhile, the FBI had begun investigating Rudolph for foreign murder. Around August 2020, FBI agents approached Rudolph's son to talk about the investigation. The son then told Rudolph about the FBI's visit. Rudolph relayed that news to Milliron and told her what he had learned about the investigation.

In December 2021, the government filed a criminal complaint against Rudolph. The complaint charged foreign murder as well as mail fraud related to Bianca's life-insurance proceeds. A few weeks later, Milliron attended a hearing on Rudolph's motion to dismiss that complaint. At that hearing, she heard the government lay out its case.

The next day, Milliron appeared via subpoena before the grand jury that was investigating Rudolph. She testified for over an hour, discussing among other things her relationship with Rudolph and his comments about the FBI's investigation. Soon after, the grand jury indicted Rudolph. And a month later, it indicted Milliron too, based on her testimony.

## II.    Procedural History

The grand jury indicted Milliron on five counts of perjury, 18 U.S.C. § 1623(a); one count of accessory after the fact to foreign murder, 18 U.S.C. §§ 3, 1119, 1111; and one count of obstruction of justice, 18 U.S.C. § 1503(a). Each charge stemmed from her grand-jury testimony. After a fourteen-day joint trial with Rudolph, the jury convicted Milliron on two of the five perjury counts (Counts Six and Nine), the accessory count (Count Three), and the obstruction count (Count Four).[1]

Milliron moved for a new trial and a judgment of acquittal. The district court denied her motion. Later, the court sentenced Milliron to 204 months' imprisonment, an upward variance from the sentencing guidelines. Milliron timely appealed.

### DISCUSSION

We consider Milliron's challenges to her perjury convictions, then her challenges to her accessory-after-the-fact and obstruction convictions. We vacate her perjury conviction on Count Six and affirm her other convictions.

## I.    Perjury Convictions

To prevail on a perjury charge under 18 U.S.C. § 1623(a), the government must prove four elements beyond a reasonable doubt: (1) that the defendant made a statement while under oath before a grand jury, (2) that the

---

[1] The jury convicted Rudolph on both of his charges. We affirmed. *Rudolph*, 152 F.4th at 1239.

statement was false, (3) that the defendant knew the statement was false, and (4) that the statement was material to the grand-jury proceeding. *See United States v. Leifson*, 568 F.3d 1215, 1220 (10th Cir. 2009); *see United States v. Strohm*, 671 F.3d 1173, 1177–78 (10th Cir. 2011). Milliron concedes that she testified under oath before a grand jury.

We review de novo whether sufficient evidence supports a conviction. *See United States v. Schulte*, 741 F.3d 1141, 1152 (10th Cir. 2014). We view the evidence in the light most favorable to the verdict. *Id.* And when a perjury charge alleges more than one knowingly false, material statement, we affirm even if a reasonable jury could find that only one of the charged statements was knowingly false and material. *Strohm*, 671 F.3d at 1185 n.14. To that end, the jury "is best equipped to determine the meaning that a defendant assigns to a specific question." *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986).

"Precise questioning is imperative as a predicate to the offense of perjury." *Bronston v. United States*, 409 U.S. 352, 362 (1973). "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360. This is so even when the witness's "answers were not guileless but were shrewdly calculated to evade." *Id.* at 362. With that in mind, we turn to Milliron's two perjury convictions.

## A.    Count Six

We begin by laying out the indictment's exact language and identify in bolded brackets what we'll call Question 1 and Question 2:

7

<u>Count 6</u>

On or about January 5, 2022, in the State and District of Colorado, the defendant LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury of the United States sitting in the District of Colorado, knowingly made false material declarations, that is, MILLIRON gave the following underlined false testimony:

Q:    Why was Larry paying you this additional money if you already had a salary for those things?

A:    Because he wanted to help me.

Q:    Did he explain why?

A:    He was very generous.

      . . . .

Q:    So in 2015 you received approximately double your salary— or your salary again but all in cash?

A:    Yes[.]

Q:    And in 2016 you received a little bit more than your salary in cash?

A:    Yes.

Q:    **[Question 1]** Why was Larry so generous to you?

A:    <u>I don't know why</u>. But like I said, he would give other—staff members, he would buy them washers and dryers. He would give them cash if they needed it, a whole variety of things.

Q:    **[Question 2]** So your testimony before the members of the Grand Jury today is that you don't know exactly why he gave you $60,000 in 2015?

A:    <u>I don't know exactly why</u>.

J. App. vol. 1, at 99–100.

8

Milliron argues several theories, but we begin—and end—with whether the jury had sufficient evidence to find that her statements were knowingly false.[2] It didn't.

On Question 1, Milliron argues that because of "the inherent difficulty in one person knowing what truly motivates another person's actions, no reasonable jury could conclude that Milliron's initial 'I don't know why' response was knowingly false." Op. Br. at 19–20. And on Question 2, she argues that she "truthfully respond[ed] to a precise question with an equally precise answer." *Id.* at 19.

Guided by *Lighte*, we agree with Milliron. 782 F.2d at 374. In that case, the defendant testified before a grand jury investigating a blood-plasma center. *Id.* at 369–70. He was asked about another person's trust account that bore his name. *Id.* at 371 n.1. The prosecutor asked, "How do you know it's [the other person's] account?" *Id.* The defendant answered, "Because he told me." *Id.* Soon after, the prosecutor asked, "Why would [the other person] tell you he was setting up [an account] in your name?" *Id.* The defendant answered, "I don't know." *Id.*

---

[2] Early in her prosecution, Milliron referenced the "perjury trap" doctrine, which we've yet to consider in this circuit. That doctrine bars perjury prosecutions in which the government executes a "premeditated design . . . to trap the witness into perjury in . . . an unfair way." *See United States v. Simone*, 627 F. Supp. 1264, 1269 (D.N.J. 1986) (emphasis omitted); *see generally* Bennett. L. Gershman, *The "Perjury Trap"*, 129 U. Pa. L. Rev. 624 (1981). She does not argue this doctrine on appeal.

The Second Circuit held that the defendant's "I don't know" answer couldn't support a perjury conviction. *See id.* at 374. That's because the question required the defendant to "speculate as to [the other person's] motives." *Id.* And the defendant "could truthfully respond that he did not know the reasoning underlying [the other person's] behavior."[3] *Id.*

In Question 1, Milliron was asked to speculate about Rudolph's motives, and she answered, "I don't know." Supp. App. vol. 2, at 357. And in Question 2, she was asked to more precisely speculate, and she again said she didn't know.

As in *Lighte*, Milliron's answers were not knowingly false. *See* 782 F.2d at 374. Stated plainly, a witness generally can't be convicted of perjury for saying she didn't know what went on inside another person's head. This squares with our general aversion to speculative testimony, *see, e.g.*, *United States v. Tapaha*, 891 F.3d 900, 906 (10th Cir. 2018), including witnesses' testifying without foundation about a defendant's state of mind. *See United States v. Hoffner*, 777 F.2d 1423, 1426 (10th Cir. 1985). Our analysis would differ if there were evidence that Rudolph had told Milliron why he gave her money in 2015 and 2016. *See id.* But as we explain, there isn't.

---

[3] To be sure, this section of *Lighte* concerned the literal-truth defense. *See* 782 F.2d at 373–74. But its logic applies equally to whether the evidence sufficed to prove that a statement was knowingly false. *See Strohm*, 671 F.3d at 1185.

### 1.    Milliron's Indicted Testimony

Before addressing the government's arguments head on, we present Milliron's testimony that she gave just before the answers underlying her criminal charges.

The prosecutor asked Milliron about Rudolph's individual cash gifts. Having handed Milliron a book of deposit slips, the prosecutor showed her a sequence of deposits from 2014 through 2021 and confirmed that she deposited "a couple of hundred dollars at a time." Supp. App. vol. 2, at 355. Milliron explained that these gifts were for "expenses" like "bills" and "education." *Id.* The prosecutor then asked her why Rudolph gave her "*this* additional money" and whether Rudolph "explain[ed] why." *Id.* (emphasis added). Milliron nonresponsively answered that Rudolph "was very generous." *Id.* at 356.

The prosecutor handed Milliron another exhibit, which totaled these cash deposits into annual summaries.[4] The prosecutor then pointed out that Milliron had deposited $60,000 in 2015 and $75,450 in 2016.

At that point, the prosecutor asked Milliron why Rudolph was "so generous" to her (Question 1). And to reiterate that he was asking about gifts from a specific period, the prosecutor then asked (Question 2): "you don't

---

[4] The parties did not identify the actual documents shown to Milliron, but in his closing, the prosecutor said: "Now this is what she was looking at when she was asked those second two questions. . . . *[T]his is clearly an annual summary*." J. App. vol. 19, at 4933 (emphasis added).

know *exactly why* [Rudolph] gave you $60,000 in 2015?" *Id.* at 357 (emphasis added).

It's not clear to us "exactly why" Rudolph gave Milliron $60,000 in 2015, nor why he was "so generous" to her in 2015 and 2016. For all we know, he may have given her that money for fear of a costly divorce, fear of damage to his reputation and dental practice, love for Milliron's children, compensation for not having left Bianca earlier, and so on.[5] Nor do we think there's record evidence for Milliron, the grand jury, or the petit jury to have inferred why. And though we generally leave this sort of interpretation to the jury, we can't affirm a conviction based on a jury's guess. *See United States v. Farmer*, 137 F.3d 1265, 1269–70 (10th Cir. 1998).

To the government, this epistemological mountain is a molehill. Milliron *must* have known why Rudolph was so generous and gave her $60,000 in 2015: because they were in a relationship. To show this, the government marshals several facts:

(1)    Milliron introducing Rudolph as her boyfriend,

(2)    Their countless intimate emails, including Rudolph calling her the love of his life,

---

[5] Another possible reason that Rudolph gave Milliron that money was to keep her from revealing his perjury in earlier, unrelated civil litigation. In 2013, he sued his hunting club for defamation, alleging that its officers falsely accused him of cheating on his wife. During that litigation, he denied that he was having an affair—let alone communicating—with Milliron. But at trial in this case, he admitted that this was a lie: he had been having an affair with Milliron at the time.

(3)   His confession that he killed his wife for her,

(4)   Testimony from Rudolph's other employees that they did not receive anywhere near the cash that Milliron received,

(5)   Rudolph's efforts to help Milliron's children financially,

(6)   Milliron thanking him for sending her to Paradise and telling him that in return she would "pamper the hell out" of him with sex and champagne,

(7)   The switch from cash payments to a credit card following Bianca's death, and

(8)   His own testimony that he gave her money because she was his girlfriend.

Resp. Br. at 20–21 (citation modified).

Missing from this list is any message, email, or other evidence showing that Milliron knew "the reasoning underlying" Rudolph's gifts in 2015 and 2016. *See Lighte*, 782 F.2d at 374. And without a foundation, a witness cannot be prosecuted for disclaiming knowledge of another person's motivations.

### 2.   Milliron's Later Testimony

The government next argues that Milliron later admitted "she *did know* why [Rudolph] gave her the money." Resp. Br. at 21.

We disagree with the government's reading of Milliron's testimony. And to explain why, we quote her testimony at length:

Q:   Do you remember him giving you $4,000 on February 18th, 2016?

A:   No, I do not.

13

Q:    Would you agree that $4,000 is a lot of money?

A:    Yes, that's a lot of money.

Q:    Do you remember what you used it for?

A:    I don't remember.

Q:    Why did he give you $4,000?

A:    I don't remember why he did.

Q:    That was on February 18th. If you go down, again, to February 20th, 2016. Now we're on page 137.

A:    Yes.

Q:    So he gave you $4,000 on February 18th, 2016, and then $3,400 on February 20th, 2016; is that right?

A:    I don't know when he gave it to me.

Q:    But that's when you deposited it?

A:    That's when it was deposited.

Q:    When you got these cash deposits, did you deposit them immediately, or did you hold onto it for a little bit?

A:    I don't remember.

Q:    So in total, though, you deposited approximately $7,400 in this span of three days?

A:    Yes.

Q:    If you go to the next one on page 138, do you see that?

A:    Yes.

Q:    Two days after that did you deposit $3,460?

A:    I don't remember.

Q:    All told, that's a lot of money, right?

A:    Yes.

Q:    Do you remember why Larry gave you all that money?

A:    I don't remember.

Q:    Ms. Milliron, were you in a relationship with Larry Rudolph?

A:    Yes.

Q:    What was the relationship?

A:    Well, we had a working relationship, and we also had a personal relationship. We would travel together.

Q:    What was the nature of the personal relationship?

A:    We were friends.

Q:    Were you ever anything more than friends?

A:    Yes. We traveled mostly.

Q:    When did that relationship begin?

A:    Shortly – well, I don't know if it was shortly – after I started working for him. It was probably back in 2003 or '4.

Q:    Were these payments part of that relationship?

A:    I don't know how to answer that.

Q:    Were you having a sexual relationship with him?

A:    We did occasionally.

Q:    Was he supporting you financially?

A:    You could say that.

Q:     These cash payments, was that part of his supporting you?

A:     I would say so.

Q:     While you were in a relationship with him?

A:     Yes.

Q:     And the payments to your daughter, was that also part of the relationship?

A:     Yes.

Q:     So earlier, when you said you didn't know why he was giving you all this money, do you now have a better understanding of why he might have been giving you this money?

A:     Well, I did know why he gave me money. I just don't know specifically each one, what it was for.

Supp. App. vol. 2, at 360–62.

Each side claims that Milliron's last answer supports its position. To the government, it shows that Milliron indeed knew why Rudolph gave her "the money." Resp. Br. at 21. And to Milliron, it shows that when she was asked precise questions, she gave precise answers.

We disagree with the government. When reviewing the sufficiency of the evidence, we don't make "*every potential* inference" in the government's favor; instead, we make "only those inferences reasonably and logically flowing from . . . [the] evidence." *Goldesberry*, 128 F.4th at 1192 (citation omitted). Look closely at the last question. The prosecutor says: "earlier, when you said you didn't know why he was giving you *all this money*." Supp. App. vol. 2, at 362 (emphasis added). He's not referring to the charged statements about Rudolph's

16

generosity from several minutes (and some fifty questions) before; he's referring to when he asked, just then, why Rudolph had given her "all that money"—meaning three deposits in February 2016. *Id.* at 361. Milliron had answered, "I don't remember." *Id.* at 360–61. So her final answer—that she knew "why he gave me money"—wasn't referring to her answers to Questions 1 and 2 from several minutes before. *See id.* at 362. And inferring otherwise doesn't "reasonably and logically" flow from the evidence. *Goldesberry*, 128 F.4th at 1192 (citation omitted).

Next, and more subtly, the government argues that Milliron's last answer shows that she "could answer the question without speculating about Rudolph's mental state." Resp. Br. at 21.

Perhaps Milliron's later answer—"I did know why he gave me money"—set some foundation for her to testify about Rudolph's motivations. Supp. App. vol. 2, at 362. But the questions in the indictment were (1) why he was "so generous" to her in 2015 and 2016 and (2) "exactly why" he gave her "$60,000 in 2015." J. App. vol. 1, at 100. Milliron's generic statement doesn't lay a foundation that Milliron knew why Rudolph was "so generous" to her and "exactly why" he gave her $60,000 in 2015. Knowing why someone gives you money differs from knowing why he was "so generous" over two specific years, and it also differs from knowing "exactly why" he gave a specific quantity in a

17

specific year.[6] *See id.* Put another way, Milliron's statement didn't lay a foundation to testify to either of those highly specific facts. So contrary to the government's argument, Milliron never said she knew what motivated Rudolph in 2015 and 2016.

Finally, the government argues that Milliron lied in her responses to Questions 1 and 2 by not answering that Rudolph gave her money in 2015 and 2016 because they were in an intimate relationship. But when the prosecutor succinctly asked if Milliron was in a relationship with Rudolph, she unequivocally said yes.

We conclude with an important reminder. To address imprecise and evasive testimony, prosecutors should ask better questions rather than pitch perjury charges. *See Bronston*, 409 U.S. at 362; *United States v. Sainz*, 772 F.2d 559, 564 (9th Cir. 1995) (reversing a perjury conviction because the witness answered truthfully after the prosecutor "narrowed the focus of his questioning to the information actually sought"). At bottom, the prosecutor's purpose is "to obtain the truth," not "to obtain perjury." *United States v. Shotts*, 145 F.3d 1289, 1299 (11th Cir. 1998) (emphasis omitted).

\* \* \*

---

[6] After Milliron said she knew why Rudolph gave her money, the prosecutor didn't follow up and ask why.

Briefly, because both parties address them, we discuss our circuit's defenses to perjury based on literal truth and ambiguity. Neither defense applies to the exchange that led to Count Six.

The literal-truth defense bars perjury convictions based on nonresponsive but literally true statements. *Strohm*, 671 F.3d at 1183–84. Milliron's conviction doesn't fit because we've held that the defense applies only when an answer is nonresponsive. *Id.* at 1185. And *Strohm* held that "I don't know" *is* responsive. *Id.* So the literal-truth defense doesn't help Milliron.

Nor does Milliron's case fit neatly into our fundamental- and arguable-ambiguity defenses. Those defenses require a question to be so unclear that reasonable people would not know what the prosecutor is asking. *See Farmer*, 137 F.3d at 1268–69. But the questions leading to the statements in Count Six were not confusing. They were just imprecise. They asked a witness to report from inside another person's head. And unless the government can show that the witness has a firm foundation for that knowledge, it shouldn't indict a witness for saying that he or she *doesn't* know.

\*     \*     \*

Because there was insufficient evidence for a reasonable jury to find that Milliron's statements in Count Six were knowingly false, we vacate her conviction on that count.

19

**B.     Count Nine**

We again start with the indictment:

<u>Count 9</u>

On or about January 5, 2022, in the State and District of Colorado, the defendant LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury of the United States sitting in the District of Colorado, knowingly made false material declarations, that is, MILLIRON gave the following underlined false testimony:

Q:     Did [Rudolph] say anything about the merits of an investigation?

A:     I don't recall.

Q:     Did he say anything about whether [Bianca's death] was an accident?

A:     No. He had told me previously it was an accident.

         . . .

Q:     Did he proclaim his innocence?

A:     <u>He probably did. I don't really recall that.</u>

Q:     What do you recall?

A:     I really don't recall.

Q:     As you sit here today with the members of the Grand Jury, you don't recall a conversation with Mr. Rudolph about an FBI investigation?

A:     There has been conversation about that, but I think he was aggravated. I can't give you specifics.

Q:     Can you give me generalities?

A:     <u>Irritated that there was an FBI investigation because he felt he was innocent.</u>

J. App. vol. 1, at 102.

Milliron argues that the government didn't provide sufficient evidence that either of Count Nine's statements were knowingly false or material to the grand jury's proceedings. We disagree. A reasonable jury could find Milliron's statement, "He probably did," to be both knowingly false and material. And because Milliron's argument doesn't address the latter part of the statement—"I don't really recall that"—we consider only "He probably did." *See* Op. Br. at 23–26.

### 1.     Knowingly False

The prosecutor's question focused on a specific conversation between Rudolph and Milliron months after he told her that he had killed his wife. For a reasonable jury to find Milliron's statement knowingly false, the government had to prove, beyond a reasonable doubt, that Milliron knew that Rudolph *didn't* proclaim his innocence to her in that conversation. So we first establish the timing of when Rudolph and Milliron spoke. We then consider the circumstances that a reasonable jury could have considered.

First, we lay out a timeline to find when the relevant conversation took place. Start back in January or February 2020, when a bartender and patrons at the steakhouse heard Rudolph say to Milliron, "I killed my fucking wife for you." *Rudolph*, 152 F.4th at 1211 (citation modified). Fast-forward to August

21

2020, when the FBI approached Rudolph's son to talk about the investigation, after which the son told Rudolph about the visit. Finally, fast-forward again to May 2021, when Milliron took an unplanned flight away from Pittsburgh because FBI agents showed up at her house and she "didn't want to speak with them." Supp. App. vol. 2, at 386–87.

Now refocus on the grand-jury testimony that was the subject of Count Nine. The prosecutor asked Milliron, "Who told you that there was an FBI investigation?" *Id.* at 387. Milliron answered that Rudolph had told her and that he had known about the investigation from "when the FBI knocked" on his son's door. *Id.* at 388. Then the prosecutor asked Milliron, "Did you have a conversation with Mr. Rudolph about the FBI's investigation?" *Id.* at 389. Milliron said yes. Drawing reasonable inferences from the evidence above, this conversation happened *after* the FBI spoke with Rudolph's son but *before* May 2021, when Milliron left Pittsburgh to avoid speaking to the FBI.

The prosecutor kept asking Milliron about the conversation. He asked if Rudolph "proclaim[ed] his innocence." *Id.* at 390. Milliron responded, "He probably did. I don't really recall that." *Id.*

Now we can consider the circumstances from which a jury could infer—beyond a reasonable doubt—that Milliron's statement was knowingly false. Rudolph and Milliron's relationship differed from Rudolph's relationship with anyone else in two key respects.

First, by the time of her grand-jury testimony, Milliron had been Rudolph's trusted confidante and mistress for over fifteen years. At Rudolph's instruction, she had ordered the propofol that he wanted in case of an "accident" on Bianca's penultimate safari. J. App. vol. 14, at 3510. She received Rudolph's first communique about Bianca's death—that "there had been an accident"—which a reasonable jury could interpret as, "it's done." *See* J. App. vol. 18, at 4561. And Milliron didn't respond. In sum, the jury could infer that long before her grand-jury testimony, Milliron knew that Rudolph planned to kill Bianca.

Second, before their conversation, Rudolph had told Milliron—in public—that he was guilty. In this respect, Milliron was unlike Rudolph's hunting guides, Zambian law enforcement, American consular officials, the insurance investigators, Bianca's brothers, the FBI, the jury, the judge at sentencing, and Rudolph's own children. Rudolph may well have scrupulously maintained his innocence with *everyone else*, but he told Milliron he was guilty.

So with these two conclusions, the jury could reasonably infer that Milliron knew that Rudolph hadn't proclaimed his innocence to her. The longtime affair; the propofol; the unanswered, post-murder text message from Zambia; Milliron's move to Rudolph and Bianca's Paradise Valley house; and Rudolph's financing of a separate Paradise Valley house with Bianca's life-insurance proceeds—all of this furnished the jury more than enough to find that

23

Milliron knew Rudolph planned to and actually did kill Bianca. And Rudolph's steakhouse utterance that he killed Bianca for Milliron cements the inference that, with Milliron, Rudolph didn't need to—and didn't—pretend innocence. A reasonable jury could conclude that Rudolph's utterance wasn't just an accidentally public confession; it was a reminder to Milliron that she owed him for murdering Bianca so they could be together.

Still, Milliron argues that the steakhouse statement "furnishes no factual basis for inferring that he could not . . . have proclaimed his innocence." Op. Br. at 24. And if we were to ignore the context of the prosecutor's question, that would be correct. If the prosecutor had asked, "did Rudolph *ever* proclaim his innocence *to anyone*," as the partial dissent interprets the question, Milliron's answer wouldn't support a perjury conviction.

But we may not "isolate[e] a question from its context . . . to give it a meaning entirely different from that which it has when considered in light of the testimony as a whole." *See Farmer*, 137 F.3d at 1269. Consider the examination leading up to the questions in the indictment: "Did you have a conversation with Mr. Rudolph about the FBI's investigation? . . . Was this conversation in person or over the phone? . . . Did he try to put you at ease?" Supp. App. vol. 2, at 389–90 (emphasis added).[7] Viewed in the light most favorable to the verdict, the

---

[7] The partial dissent states that "nothing . . . indicates that the prosecutor focused on one specific conversation between Rudolph and [Milliron] when asking whether Rudolph proclaimed his innocence." We disagree.

prosecutor asked whether Rudolph proclaimed his innocence *to Milliron* during a *specific conversation*.

That conversation occurred sometime after the steakhouse statement but before Milliron flew from Pittsburgh. And Rudolph's wielding the murder against Milliron at the steakhouse sufficed for the jury to infer that he *didn't* proclaim his innocence to her in their later conversation. In other words, a reasonable jury could infer, beyond a reasonable doubt, that Milliron lied when she said that he "probably" proclaimed his innocence.

Arguing from "experience" in the law, Milliron states that "guilty people proclaim their actual innocence *all the time*." *Id.* Fair enough. But guilty people don't typically proclaim their innocence to people who know of their guilt. It makes no sense that Rudolph would proclaim his innocence to Milliron *after* reminding her that he murdered Bianca *for her*. "Experience" gives us no reason to think that's what happened, much less to say that no reasonable jury could find otherwise.[8]

Milliron also argues that the government changed its Count Nine theory between trial and appeal. But upon review of the trial record and the government's briefing on appeal, we see no difference.

---

[8] The partial dissent posits that Rudolph may have told Milliron he was innocent even though she knew of his guilt, "to get his story straight." And perhaps Milliron could have argued that Rudolph would have told her something like "you know I'm guilty, but in case you're ever asked, I'm telling you now so you can quote me, I'm innocent. So remember to tell them I proclaimed my innocence." But she hasn't hazarded such a view.

In sum, the jury had sufficient evidence to conclude beyond a reasonable doubt that Milliron's statement about Rudolph's "probably" proclaiming his innocence was knowingly false.

### 2.    Materiality

Milliron next argues that the statements charged as perjurious were not material to the grand-jury proceedings. We review for sufficiency of the evidence, meaning we look to whether "a reasonable jury could conclude that [Milliron's statements] were material." *Strohm*, 671 F.3d at 1186 (citation omitted). Our standard for materiality is "conspicuously low." *United States v. Fernandez-Barron*, 950 F.3d 655, 658 (10th Cir. 2019) (citation modified). A false statement is material if it might have influenced the grand jury's decisions. *See Strohm*, 671 F.3d at 1186. "The testimony need not have an actual effect; it merely must be capable of influencing the decision-making body." *Id.* (citation modified). And if later circumstances render the statement immaterial, that doesn't change our analysis—we ask only whether the false statement was material when it was made. *See Fernandez-Barron*, 950 F.3d at 660.

Milliron argues that her testimony was immaterial to the grand jury's decision to indict Rudolph because (1) guilty people regularly proclaim their innocence, and (2) the grand jury had plenty of other evidence to indict him.

But those arguments miss the mark. On Milliron's first argument, the grand jury knew that Milliron was Rudolph's intimate confidante. So Rudolph's

proclaiming his innocence to Milliron might have carried more weight with the grand jury than his proclaiming it to the world at large—which is certainly enough weight to meet our "conspicuously low" standard. *Id.* at 658.

On Milliron's second argument, we reiterate that we look at the materiality of the false testimony. *See Strohm*, 671 F.3d at 1186. That is, we need not weigh its materiality relative to the other evidence presented. *Cf. United States v. Williams*, 934 F.3d 1122, 1129 (10th Cir. 2019) (holding in a false-statement prosecution that a "statement can be objectively material even if the decision maker did not consider it" (citation omitted)). So we reject that argument.

*    *    *

Because there was sufficient evidence for the jury to find that one of Milliron's statements in Count Nine was knowingly false and material, we affirm her perjury conviction on that count.[9]

## II.    Accessory-After-the-Fact Conviction

Milliron argues that her accessory-after-the-fact conviction fails because that crime cannot rest on perjury alone. First, she argues that based on the plain language of the accessory statute, 18 U.S.C. § 3, Congress intended accessory

---

[9] Because we affirm Milliron's perjury conviction on Count Nine, we need not address her arguments that depend on our vacating *both* perjury convictions.

liability to require more than just perjury. Second, she argues the same based on the statutes' different sentencing ranges.

We review de novo a defendant's challenge to the interpretation of a federal criminal statute. *United States v. Davey*, 151 F.4th 1249, 1253 (10th Cir. 2025). Generally, when a statute is unambiguous, we apply its plain meaning. *United States v. Hopson*, 150 F.4th 1290, 1302 (10th Cir. 2025).

## A.    Plain Language

Milliron first argues that the government reads the accessory-after-the-fact statute too broadly. Here's the statute:

> Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

18 U.S.C. § 3. To Milliron, the terms "receives, relieves, comforts or assists the offender" "suggest" "affirmative conduct" beyond "simply making statements to . . . a grand jury." Op. Br. at 35–36 (citation modified).

We could just say that lying to a grand jury to prevent someone who committed a crime from going to trial "assists [that] offender." 18 U.S.C. § 3. That said, if we were writing on a blank slate, we might take a hard look at the words around "assists" to avoid giving it "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) (citation omitted).

28

But we aren't writing on a blank slate. Instead, we're bound by *United States v. Day*, 533 F.2d 524 (10th Cir. 1976). In *Day*, we held that false statements to an investigator about details of a crime sufficed to prove accessory after the fact. *Id.* at 526. The defendant was one of three inmates planning to kill another inmate. *Id.* at 525. The defendant lured the victim into the prison chapel, and another inmate killed him. *Id.* Later, the defendant falsely told an FBI interrogator that the victim had been attacked by three people in masks whom the defendant could not identify. *Id.* at 525–26. But, in fact, he knew each of the participants' identities. *Id.* at 526. He was charged and convicted of accessory after the fact. *Id.* at 525.

On appeal, the defendant argued that the government didn't introduce sufficient evidence that he "assisted the participants in order to hinder or prevent their apprehension, trial, or punishment." *Id.* at 526. We disagreed, holding that the investigator's testimony explaining the defendant's lies served as this element's "substantial proof." *See id.* So *Day* tells us that making false statements to an investigator to cover up someone else's crime *can* prove accessory after the fact. *See id.*; *see also United States v. Roach*, 502 F.3d 425, 445 (6th Cir. 2007) (affirming a police officer's conviction for accessory after the fact based on his lying to an investigator).

Milliron argues that *Day* did not explicitly reject the argument she makes here. Maybe so, but it got close enough. The defendant in *Day* argued that there was no proof that he "in some way assisted the participants in order to hinder

29

or prevent their apprehension, trial, or punishment." 533 F.2d at 526. We then held that his lying to the investigator satisfied this element. *Id.* Milliron hasn't distinguished how the defendant's lying to an investigator to protect his associates in *Day* differs from her lying to a grand jury to protect Rudolph, so we reject her argument.

Next, Milliron points to *United States v. Lepanto*, in which we said we were "not convinced that Congress intended" the accessory statute to require "enthusiastic cooperation with investigating authorities" "on pain of imprisonment in every instance." 817 F.2d 1463, 1468 (10th Cir. 1987). In *Lepanto*, the defendant knew that his brother was making bombs in their shared apartment. *Id.* The local police and the United States Postal Inspection Service interviewed the defendant, asking if his brother lived with him. *Id.* at 1464 n.1. The defendant lied and said his brother lived in another city. *See id.* Partly on that basis, the defendant was convicted as an accessory after the fact. *Id.* at 1464 & n.1.

Though we affirmed that conviction based on other evidence, we doubted whether Congress intended the accessory statute to mandate "enthusiastic cooperation with investigating authorities." *Id.* at 1464, 1468. Our doubt arose from fear of "imposing a criminal penalty for . . . every false unsworn statement . . . to a federal officer." *See id.* at 1468 (citation omitted).

*Lepanto* doesn't control here. To start, Milliron testified under oath, not in an "unsworn statement."[10] *Id.* Next, earlier panel decisions bind later panels unless there's "en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Reed*, 39 F.4th 1285, 1295 (10th Cir. 2022). And *Lepanto* came after and even cited *Day*. 817 F.2d at 1467. So if *Lepanto* aimed to limit *Day*'s holding, we'd expect it to say so—and it doesn't. Finally, we aren't bound by an earlier panel's dicta—as in, reasoning not essential to the panel's holding. *Tokoph v. United States*, 774 F.3d 1300, 1303 (10th Cir. 2014). And in *Lepanto*, our remark about "enthusiastic cooperation" was necessarily dicta because we affirmed the defendant's accessory conviction on other grounds and expressly chose "not [to] decide the issue." *See* 817 F.2d at 1468.

Milliron also points to our decision in *McFarland v. Childers*, 212 F.3d 1178 (10th Cir. 2000). Though *McFarland* mentions *Lepanto* while discussing a state's accessory statute, it otherwise interprets state law. *Id.* at 1189. Plus,

---

[10] Also, Milliron knew of the proceedings in advance from her subpoena. She had the right to challenge her subpoena through judicial review. *See, e.g.*, *In re Grand Jury Proc.*, 616 F.3d 1186, 1191 (10th Cir. 2010). And she knew what the grand-jury proceedings were about from attending the hearing on Rudolph's motion to dismiss. When she entered the grand-jury proceedings, she was put under oath, and she learned of her rights to pause the proceedings, consult counsel, and refuse to answer incriminating questions. She was told that false statements could result in charges against her. In short, she received many procedural protections that the defendant in *Lepanto* likely did not.

*McFarland* supports Milliron's conviction. As we then wrote, "there are arguably some false statements that may conceal or aid offenders." *Id.*

Next, Milliron points to the Seventh Circuit's decision in *United States v. Osborn*, 120 F.3d 59 (7th Cir. 1997). But *Osborn* only reiterates that courts, including the *Lepanto* court, have doubted, but never held, that the accessory statute allows "a simple lie to authorities" to prove accessory after the fact. *Id.* at 64. So *Osborn*, too, doesn't distinguish *Day*.

Finally, Milliron points to a federal district court's decision in *Ortega v. Evans*, No. 08-CV-00894, 2009 WL 1085483 (E.D. Cal. Apr. 22, 2009). She quotes the decision's excerpt from a state court's ruling that "[a] mere withholding of information is not equivalent to supplying affirmative and deliberate falsehoods." Op. Br. at 35 (citing *Ortega*, 2009 WL 1085483, at *8). But Milliron's Count Nine statement *was* an affirmative and deliberate falsehood. And before excerpting the state court's reasoning, the district court explained that under that state's law, "affirmative and deliberate falsehoods" *can* prove accessory after the fact. *Id.* at *7 (citations omitted). So *Ortega* doesn't help Milliron, either.

### B.    Different Sentencing Ranges

Milliron next argues that because accessory after the fact's maximum sentence is fifteen years, while perjury's is only five, Congress didn't want accessory and perjury convictions for the same conduct. The government

responds that this discrepancy makes sense because the accessory statute contemplates a wide range of conduct.

We agree with the government that there are many ways to be an accessory after the fact. *See e.g.*, *Day*, 533 F.2d at 526 (lying to an investigator); *United States v. Martinez*, 342 F.3d 1203, 1204 (10th Cir. 2003) (disposing of a shotgun); *United States v. Henning*, 77 F.3d 346, 348, 350 (10th Cir. 1996) (moving and disposing of a victim's body). Yet Milliron's argument highlights a valid concern. Were the government to add an accessory charge to almost every indictment for perjury before a grand jury, it might present an overcharging problem.[11]

Still, beyond pointing to this discrepancy in maximum sentences, Milliron hasn't developed this argument. So we reject it.

\* \* \*

Because Milliron's conduct fell within our circuit's interpretation of 18 U.S.C. § 3, we affirm her conviction under that statute.

## III.  Double Jeopardy

Milliron challenges her obstruction conviction on double-jeopardy grounds. To her, obstruction of justice is a lesser-included offense of perjury,

---

[11] This is not to say that every perjury indictment *could* carry accessory charges. That's because a witness before a grand jury may commit perjury without intending to assist another person. For example, a witness may intend to help only himself. *See, e.g.*, *United States v. Hasan*, 609 F.3d 1121, 1124–25, 1128, 1133, 1138 (10th Cir. 2010).

so the Fifth Amendment's Double Jeopardy Clause protects her from being sentenced for both. The government responds that Milliron waived this argument by not raising it in the district court and that she has not argued for plain-error review on appeal.

We need not decide waiver because there's no error. Milliron's double-jeopardy argument is a multiplicity challenge, which we review de novo. *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013). Though indictments may contain multiplicitous charges—for example, lesser-included offenses—separate sentences for multiplicitous convictions violate the Double Jeopardy Clause. *See id.*; *United States v. Morris,* 247 F.3d 1080, 1083 n.2 (10th Cir. 2001).

To decide whether one offense is a lesser-included offense of another, we apply the test from *Blockburger v. United States*, 284 U.S. 299 (1932). *See United States v. Isabella*, 918 F.3d 816, 848 (10th Cir. 2019). Under *Blockburger*, if one offense requires proof of a fact that another does not, then the first is not a lesser-included offense of the second. *See id.* And "proof of a fact" means the "elements of the crimes, not the acts charged in the indictment." *See United States v. Angilau*, 717 F.3d 781, 787 (10th Cir. 2013) (citation omitted); *accord United States v. Dixon*, 509 U.S. 688, 704 (1993).

Obstruction of justice under 18 U.S.C. § 1503(a) requires (1) a proceeding pending before a federal court or grand jury; (2) that the defendant knew of the proceeding and "influenced," "obstructed," or "impeded" the "due

administration of justice in that proceeding," or else "endeavored" to do so; and (3) "that the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." *See* 10th Cir. Crim. Pattern Jury Instruction 2.62 (rev. Mar. 11, 2026); *United States v. Erickson*, 561 F.3d 1150, 1160 (10th Cir. 2009).

Perjury under 18 U.S.C. § 1623(a) requires (1) that a defendant made a statement under oath before a court or grand jury, (2) that was false, (3) that the defendant knew that the statement was false, and (4) that the statement was material to the proceeding. *See* 10th Cir. Crim. Pattern Jury Instruction 2.66; *see Leifson*, 568 F.3d at 1220.

The difference lies in the two crimes' intent requirements. For obstruction, the government must prove a defendant's specific intent to subvert or undermine the administration of justice. *E.g.*, *United States v. Williams*, 874 F.2d 968, 980 (5th Cir. 1989). But for perjury, it need prove only the defendant's intent to make a knowingly false statement. *See id.* Put differently, perjury doesn't require an intent to obstruct a proceeding. *See United States v. Langella*, 776 F.2d 1078, 1082 (2d Cir. 1985). And because obstruction requires proof of a fact that perjury does not, obstruction (§ 1503) is not a lesser-included offense of perjury (§ 1623). Other circuits that have considered this question have held the same. *See, e.g.*, *id.* at 1079, 1082; *United States v. Rankin*, 870 F.2d 109, 111 (3d Cir. 1989); *United States v. Bridges*, 717 F.2d

1444, 1449 & n.30 (D.C. Cir. 1983); *see also United States v. Hill*, 442 F. App'x 811, 814 (4th Cir. 2011).

To Milliron, "since a statement has to be knowingly—that is, intentionally—false to constitute perjury," that statement "will always" show an intent "to influence, obstruct, or impede" a proceeding. Op. Br. at 41 (citation modified).

We disagree. Though intending to lie and intending to obstruct a proceeding might be "quite similar, they are not identical." *Williams*, 874 F.2d at 980. For obstruction based on false statements, and unlike for perjury, the government must prove an intent to obstruct. *See id.*; *see also United States v. Grubb*, 11 F.3d 426, 437 (4th Cir. 1993).

In sum, we reject Milliron's double-jeopardy argument, and we affirm her conviction on Count Four.

\* \* \*

Milliron's remaining arguments hinged on our either overturning Rudolph's convictions or both of her perjury convictions. Another panel affirmed Rudolph's convictions. *Rudolph*, 152 F.4th at 1239. And we just affirmed one of Milliron's perjury convictions. So we need not consider her remaining arguments.

**CONCLUSION**

We affirm the jury's verdict except for Milliron's conviction on Count Six, which we vacate. We remand to the district court for further proceedings.

36

*United States v. Milliron*, 23-1217

**CARSON**, J., concurring in part and dissenting in part.

I agree with the majority that the evidence was insufficient for a reasonable jury to find that Defendant Lori Milliron's statements in Count Six were knowingly false. I also agree with the majority's rejection of Defendant's double jeopardy argument and its conclusion regarding the accessory after the fact conviction.

But I respectfully part ways with the majority on whether the evidence was sufficient for a reasonable jury to find that Defendant's statements in Count Nine were knowingly false. They weren't.

Recall the following exchange that underlies Count Nine:

> Q: Did he proclaim his innocence?
> A: He probably did. I don't really recall that.
> …
> Q: …you don't recall a conversation with Mr. Rudolph about an FBI investigation?
> A: There has been a conversation about that, but I think he was aggravated. I can't give you specifics.
> Q: Can you give me generalities?
> A: Irritated that there was an FBI investigation because he felt he was innocent.

Recall, too, that the government traces the knowing falsity of the above answers to the argument Rudolph and Defendant had at that steakhouse bar where one witness testified that Rudolph said, "I killed my fucking wife for you." The government argues Rudolph admitted to killing his wife. Because he admitted to killing her, the government reasons, he would never have proclaimed his innocence. Thus, according to the government,

1

Defendant had to be lying when she said in "generalities" that Rudolph told her "he felt he was innocent."

But guilty people often proclaim their innocence. And indeed, the record contains at least *forty-five* instances of Rudolph proclaiming his innocence:

1. Criminal Complaint (Rudolph told Zambian police that he was in the bathroom when Bianca shot herself and he tried to resuscitate her, telling Zambian police that he suspected that she discharged it while trying to pack it). J.A. Vol. 1 at 51.
2. Criminal Complaint (Rudolph told the consular chief that Bianca died of an accidental gunshot wound). Id. at 53.
3. Criminal Complaint (Rudolph told consular chief that he was in the shower when Bianca was packing and he heard the discharge and came running out of the shower). Id. at 55.
4. Criminal Complaint (Rudolph told the consular chief that Bianca may have committed suicide). Id. at 56.
5. Criminal Complaint (Insurance companies retained Diligence International to conduct due diligence related to the circumstances of Bianca's death and Diligence's report included the following statements by Rudolph: Rudolph was in the bathroom, heard a gunshot, and then heard his wife scream. He found her on the floor and performed CPR). Id. at 57–58.
6. Criminal Complaint (FBI agent believed that Rudolph's claims filed in connection with the life insurance policies were part of a scheme to defraud because Rudolph claimed, either explicitly or implicitly through the submission of his account of the death in the Zambian Police Service reports, that Bianca's death was the result of an accident). Id. at 60.
7. Criminal Complaint (Rudolph caused to be mailed a packet of documents to the insurance company that included a statement that he had not withheld any material facts from Great Western). Id.
8. Indictment (Rudolph represented and promised that Bianca had died as the result of the accidental discharge of a firearm). Id. at 93.
9. Superseding Indictment (Rudolph represented and promised that Bianca had died as the result of the accidental discharge of a firearm). Id. at 97.
10. One of several places the United States discusses the forfeiture in this case, noting that Rudolph represented that Bianca's death was an accident. The entire forfeiture order is based on this representation. J.A. Vol. 3 at 726–28.
11. Transcript of Rudolph's detention hearing (The government asked the investigator whether he gave different accounts to different people about where he was at the time of the shotgun firing, and the investigator said yes). J.A. Vol. 4 at 960–61.
    - What he told Mark Swanepoel – That he was in the bathroom using the restroom.

2

- What he told the consular official in Zambia – That he was in the shower at the time of the discharge.
- What he told Bianca's brother – That he was outside the lodge at the time of the discharge.

12. Transcript of Rudolph's detention hearing (Attorney said that he had been trying to reach the prosecutors through the investigator because he wanted to present to them evidence to show Rudolph was innocent). Id. at 994.

13. Transcript of Rudolph's detention hearing (Rudolph, on cross-examination, stated that he told the Zambian authorities that he was in the bathroom when the shooting occurred and that was written in the Zambian reports). Id. at 1004–05.

14. Sentencing Hearing Transcript (stating that what happened in Zambia "was a terrible, tragic accident. Nothing more. This was not a murder . . . .). J.A. Vol. 5 at 1236.

15. Sentencing Hearing Transcript (Judge told Rudolph that he understood that Rudolph continued to maintain his innocence). Id.

16. Sentencing Hearing Transcript ("I do reassert my innocence . . . And I did not murder her."). Id. at 1238.

17. Bianca's brother, Ralph, testified at trial about what Rudolph said happened to his sister (Rudolph told him that he was outside of the tent and he heard a gunshot and he ran in and Bianca was on the floor). J.A. Vol. 8 at 1829.

18. Bianca's brother, Vincent, testified at trial about what Rudolph said happened to his sister (Rudolph told him that they were packing up to leave and Bianca was packing her gun and it went off). Id. at 1852–53.

19. Bianca's cousin, Anthony, testified at trial about what Rudolph said happened to his cousin (Rudolph told him that he was outside and he heard a shot. He ran into the room where Bianca was and found her with a chest wound.). Id. at 1874.

20. Trial testimony of Swanepoel of what Rudolph said happened (Rudolph told him that he was in the bathroom and heard the shot and Bianca was on the floor). Id. at 1980.

21. Trial testimony of Swanepoel of what Rudolph said happened (Rudolph told him that Bianca probably tried to pack the guns away herself while he was in the bathroom). Id. at 1984.

22. Trial testimony of Malama, Zambian law enforcement, of what Rudolph said happened (Rudolph said that he was in the bathroom when Bianca was shot). J.A. Vol. 10 at 2466.

23. Trial testimony of Malama, Zambian law enforcement (said that Rudolph said he was in the bathroom during the shooting and that others heard him say that too). Id. at 2474.

24. Trial testimony of Mwiinga, Zambian funeral home director (said Rudolph introduced himself as the husband of Bianca, who died accidently while packing and cleaning her gun). Id. at 2488.

3

25. Trial testimony of Musese, Zambian national park investigator (said Rudolph said that he was taking a shower in the bathroom when he heard the gunshot, walked in, and found Bianca had accidently shot herself). Id. at 2511–12.

26. Trial testimony of Musese, Zambian national park investigator (said Rudolph said that he was taking a shower in the bathroom when he heard the gunshot). Id. at 2517. There are more mentions of this on cross. The "shower" thing is a big deal because it's inconsistent with what he told others—that he was in the bathroom.

27. Trial testimony of Jani, Zambian law enforcement (said Rudolph said he was in the bathroom when the gun fired and maybe Bianca was forcing the gun into the gun case). Id. at 2533.

28. Trial testimony of Jani, Zambian law enforcement (going over Rudolph's statement that he suspected the firearm must have been left loaded from the previous day's activities). Id. at 2542.

29. Trial testimony of Westhassel, consular official (Rudolph told him it could have been suicide or accident). J.A. Vol. 11 at 2606–07.

30. Trial testimony of Westhassel, consular official (going over the call the embassy received where Rudolph explained to Westhassel that there was an accidental discharge of a firearm and that the shooting was an accident). Id. at 2626.

31. Trial testimony of Meyer, Bianca's friend (Rudolph told her at Bianca's memorial service that Bianca died in an accidental discharge of a firearm and that he said he was in the other room at the time). Id. at 2663–64.

32. Trial testimony of Calgaro, with Fidelity Life Insurance (noting that Rudolph said the cause of death on the claim form for Bianca was accident). Id. at 2686.

33. Trial testimony of Loosle, with Ameritas Life Insurance (stating that Rudolph said the cause of death on the claim form for Bianca was accident). Id. at 2711–12.

34. Trial testimony of Loosle, with Ameritas Life Insurance (stating Rudolph submitted a letter detailing the death, which said he was in the bathroom when he heard the gunshot). Id. at 2714.

35. Trial testimony of Mirabelli, with MetLife (stating that Rudolph said Bianca told him she intended to pack the firearms while he was in the bathroom). Id. at 2730.

36. Trial testimony of Wagner, with Great-West (stating that Rudolph's attorney informed them that the discharge of firearm was accidental). Id. at 2784.

37. Trial testimony of Arnold, with Genworth Financial (stating that Rudolph checked the box for accidental death). J.A. Vol. 12 at 2987.

38. Trial testimony of Siebels, with TransAmerica (stating that Rudolph listed the cause of death as accident). Id. at 2997.

39. Trial testimony of Lawrence Rudolph (stating he absolutely did not shoot his wife). J.A. Vol. 17 at 4476.

40. Trial testimony of Lawrence Rudolph (recounting the events and that he was in the bathroom when Bianca was shot). J.A. Vol. 18 at 4548.

41. Trial testimony of Lawrence Rudolph (stating that he has always told everybody that he was in the bathroom when Bianca was shot, including the police). Id. at 4551.

4

42. Trial testimony of Lawrence Rudolph (stating that he has never confessed to killing his wife and that he has always maintained that this was an accident). <u>Id.</u> at 4581.

43. Trial testimony of Lawrence Rudolph (reiterating to the jury that he did not kill his wife). <u>Id.</u> at 4582.

44. Trial testimony of Lawrence Rudolph (stating that he said he was in the bathroom when she was shot). <u>Id.</u> at 4665.

45. Trial testimony of Lawrence Rudolph (stating that he absolutely did not kill his wife and that he is completely innocent). J.A. Vol. 19 at 4844.

To the majority, Defendant's literally true statement that Rudolph probably proclaimed his innocence constitutes perjury. The majority says for Defendant's answer *not* to support a perjury conviction, the prosecutor would have had to have asked, "Did Rudolph *ever* proclaim his innocence *to anyone*?" But the majority, to affirm the perjury conviction, essentially rewrites the prosecutor's question to state, "Did he proclaim his innocence *to you during this specific conversation*?"

The majority asserts that we must read the prosecutor's statement in context. And to the majority, the question of whether Rudolph proclaimed his innocence had to be in reference to this specific conversation—an argument the government did not make. I disagree with the majority. Not knowing when this conversation happened, the majority first lays out a timeline "to find when the relevant conversation took place." It draws reasonable inferences to conclude that this conversation happened after the FBI spoke with Rudolph's son but before Defendant left Pittsburgh to avoid speaking with the FBI. Using two conclusions, the majority determines that Rudolph could not have proclaimed his innocence to Defendant because: (1) long before her grand-jury testimony, Defendant knew that Rudolph intended to kill his wife, and (2) unlike all the other people to whom

5

he professed his innocence, Rudolph had previously admitted his guilt to Defendant at the bar.

I have three problems with the majority's analysis. First, the prosecutor did not adequately ask the question whether Rudolph pronounced his innocence to her *in that specific conversation*. Second, Defendant's response to the prosecutor was literally true—as shown in at least forty-five different places in this record. Third, even if the prosecutor aimed his question at a specific conversation, a reasonable jury could not infer that Defendant knew that Rudolph hadn't proclaimed his innocence to her.

First, the prosecutor did not ask the question the majority seems to think the prosecutor asked. The indictment and the majority both end the quote from the transcript at the same place, with Defendant answering: "Irritated that there was an FBI investigation because he felt he was innocent." The prosecutor continued as follows:

> Q. Did he ever tell you that he was just going to go and speak with the FBI?
>
> A. No.
>
> Q. Have you heard Mr. Rudolph discussing Bianca's death with anyone else?
>
> A. No, I have not.
>
> Q. Does Mr. Rudolph keep firearms in the home you have in Arizona?
>
> A. Yes.
>
> Q. What kind of firearms?
>
> A. I'm not good at firearms. He has a couple of pistols. Actually, one is mine. I'm not sure. I think he has some kind of a rifle.
>
> Q. Does he have a shotgun?

6

A. I don't know.

Q. Does Mr. Rudolph have an injury to his left hand?

This exchange follows what the majority tells us is the prosecutor questioning Defendant about a specific conversation Defendant had with Rudolph. There's no transition away from that conversation. Rather, just questions about whether Rudolph discussed his wife's death with anyone, about Rudolph's firearms, and about an injury to Rudolph's left hand—none of which involve a specific conversation between Rudolph and Defendant. Nothing to me indicates that the prosecutor focused on one specific conversation between Rudolph and Defendant when asking whether Rudolph had proclaimed his innocence.

A literal reading of the transcript shows that the prosecutor simply asked whether Rudolph had proclaimed his innocence. The record demonstrates that he had. Over fifty years ago, the Supreme Court tackled the issue of "whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." Bronston v. United States, 409 U.S. 352, 352–53 (1973). A person under oath does *not* commit perjury when he or she willfully states "any material matter that *implies* any material matter that he does not believe to be true." Id. at 357–58. Put simply, the "jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner . . . ." Id. at 359. Any "problems arising from the literally true but unresponsive answer are to be remedied through the

7

'questioner's acuity' and not by a federal perjury prosecution." Id. at 362. The government should have followed up with a more specific question to Defendant, not this perjury prosecution.

Even assuming the prosecution asked Defendant about whether Rudolph had pronounced his innocence in a specific conversation, Defendant makes the argument that guilty people proclaim their actual innocence all the time. I echo the majority here: "fair enough." But the majority says that guilty people don't typically proclaim their innocence to people who know of their guilt. It can't fathom that a person would proclaim his innocence to someone he had already given a confession. I'm not so sure. Rudolph has forty-five instances of proclaiming his innocence in the record. To me, it's reasonable he would want to get his story straight and he just might have told her that he was innocent in that conversation. I worry about the implications of the majority's result. Will the government be free to pursue perjury charges against any family member, friend, or colleague who says that a target has proclaimed his innocence when asked the question directly by a prosecutor and a jury later ends up convicting the target? Under the majority's logic, yes.

Finally, although the majority does not base its holding on this portion of the exchange, I also want to point out my discomfort with the government specifically asking Defendant *if she could speak in generalities* and then opting to pursue her for perjury. Let's review the relevant exchange again:

> Q: …you don't recall a conversation with Mr. Rudolph about
> an FBI investigation?

8

A: There has been a conversation about that, but I think he was aggravated. I can't give you specifics.
Q: Can you give me generalities?
A: Irritated that there was an FBI investigation because he felt he was innocent.

Because Defendant did not know an answer, the prosecutor asked her to give him "generalities." Defendant then answered in a most cryptic fashion: "Irritated that there was an FBI investigation because he felt he was innocent." So a question where the witness said she couldn't give specifics and the prosecutor asked her to speak in generalities led to this perjury charge and conviction. The result cannot be squared with our case law. "Precise questioning is imperative as a predicate for the offense of perjury." Bronston, 409 U.S. at 362. Indeed, courts require "near-absolute clarity from the questioner in order to support a perjury charge." United States v. Strohm, 671 F.3d 1173, 1178 (10th Cir. 2011) (quoting Linda F. Harrison, The Law of Lying: The Difficulty of Pursuing Perjury Under the Federal Perjury Statutes, 35 U. TOL. L. REV. 397, 403 (2003)). "An answer is not a *knowing* false statement if the witness responds to an ambiguous question with what he or she believes to be a truthful answer." Id. (citing United States v. Hilliard, 31 F.3d 1509, 1519 (10th Cir. 1994)). Thus, "the premium is on clear, precise questioning" and the remedy here is for the prosecutor to ask better questions, not follow up a poor question with a perjury prosecution. Id.

Put simply, the jury convicted Defendant for perjury because she gave a vague answer to a poor question that specifically asked only for generalities. Cross-examination—the greatest truth-seeking function known to the legal system—exists for this very reason. If the prosecutor believed something was amiss, he could have followed

9

up in any number of ways.  He could have asked when the conversation took place; where the conversation took place; whether it was before or after Rudolph told her that he "killed his fucking wife for [her]"; or whether she believed him.[1]  The possibilities are endless.  But, instead, the government ignores our well-established body of caselaw in asking us to uphold a perjury conviction based upon a cryptic answer to a poor question that asked only for "generalities."

And where is the evidence that the answer is a lie?  Maybe it was, but how can anyone know without relying on pure speculation and surmise?  To be sure, the record contains overwhelming evidence that Rudolph proclaimed his innocence to many people.  He maintained his innocence from the first statement in Africa to his own jury trial.  Perhaps the better question to ask Defendant was whether she believed him.  Maybe if she said yes to that question, the government could catch her in a lie.  But here, we have a bad question with a vague answer that is not clearly a lie.  Without speculation, there is not sufficient evidence to even show she was lying.

Because the jury did not have sufficient evidence to conclude beyond a reasonable doubt that Defendant's statement about Rudolph's "probably" proclaiming his innocence was knowingly false, I would vacate Defendant's conviction on Count Nine.[2]

---

[1] Had the prosecutor asked questions like these and received the same answer, perhaps the majority's theory that the prosecutor was referencing a specific conversation would work better.

[2] As to Defendant's conviction for accessory after the fact, even if we vacated the perjury convictions, Defendant still would not prevail on this count.  Defendant admits that, before the jury, the government argued that the accessory after the fact count was not limited to the perjury counts.  It told the jury that a person may make statements that

10

For these reasons, I respectfully dissent from the majority's treatment of Count Nine but join in the remainder of the majority's opinion.

---

mislead the grand jury that aren't technically lies.  So even though I dissent on the majority's treatment of Count Nine, I concur with the majority on the accessory after the fact count.